## HARFORD BANK OF BEL AIR *v.* ESTATE OF PETER LESLEY HOPPER, Deceased
[No. 20, October Term, 1935.]

*Decided December 4th, 1935.*

The cause was argued before PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*John S. Young* and *Philip H. Close,* for the appellant.

*J. Wallace Bryan* and *A. Freeborn Brown,* for the appellee.

MITCHELL, J., delivered the opinion of the Court.

Peter Lesley Hopper, a resident of Harford County, died intestate on or about the 13th day of February, in the year 1917, leaving personal estate duly appraised in the sum of $62,261.98, and real estate appraised in the sum of $37,190, or a total estate of $99,451.98. At the time of his death, he was individually indebted to various creditors, on loans for which he had pledged individual collateral, and he was jointly indebted with one J. T. C. Hopkins, Jr., in sums aggregating $24,000, representing money borrowed by Hopper and Hopkins for the purchase of bonds of the Havre de Grace Gas Company, secured by the pledge of said bonds. The latter indebtedness was carried in several financial institutions, and a part of it was carried by the Harford Bank of Bel Air, Maryland, in the form of notes as follows: One for $300, one for $1,000, and one for $4,000. The decedent left as his next of kin and sole heir at law George L. Hopper, a brother, who, together with Jackson W. Maslin, qualified as administrators upon the estate on February 27th, 1917.

That the estate was greatly involved at the time of the death of Peter Lesley Hopper there can be no doubt, as is indicated by the list of claims filed against it between the dates of March 23rd, 1917, and October 5th, 1918, the aggregate of which was over $100,000. It was evi-

dently due to this status, coupled with the fact that he was the sole heir at law, that the usual and strictly legal course of administration was not followed by the administrators. Mr. Maslin took little part in the conduct of the administration; the active negotiations were effected by Mr. Hopper, who treated the personalty in the hands of the administrators, and the realty which he took as sole heir at law, subject to the rights of the creditors of his brother, as being one and the same asset. The securities pertaining to the estate, and their appraised value, were as follows:

| | |
|---|---:|
| 432 shares preferred stock, Independent Ice Co., par value $100, @ $85 | $36,720 |
| 18 shares common stock, Independent Ice Co., par value $100 | 2,000 |
| 23 shares Havre de Grace Improvement Co. stock, par value $100, @ $50 per share | 1,150 |
| 5 shares Bauer Manufacturing Co., of no value. | |
| 5 shares Banking and Trust Co., par value $50, @ $60 per share | 300 |
| 11 bonds Havre de Grace Gas Co., par value $500, @ $450 each | 4,950 |
| 1 undivided half interest in 48 bonds Havre de Grace Gas Co., par value $500, @ $450 | 10,800 |
| | $55,920 |

As we have heretofore observed, all of the gas bonds of Hopper and Hopkins were pledged as collateral for their joint indebtedness. In addition to this, nearly all of the other securities were pledged to secure divers loans made to the deceased by various financial institutions. Instead of disposing of these securities and paying the respective indebtedness against them, George L. Hopper sought to hold them and assume personal liability for the indebtedness. To accomplish that design, he planned to refinance certain loans, and thereby gain extensions

of time for their final payment. He was fortunate in this respect, in engaging as his attorney and adviser the late Stevenson A. Williams, who had been the counsel of Peter Lesley Hopper, and who seems to have been in a position to negotiate loans for his client, as and when the same became desirable.

The plan to refinance seems to have met with the acquiescence of the creditors, who, as far as the record goes, filed no objections to what was done; and, in the course of effecting the same, it became necessary to deal with the indebtedness then due the Harford Bank, of which institution Mr. Williams was president for many years, and throughout the period accounting from the date of the death of Peter Lesley Hopper to the date of his own death, which occurred on February 20th, 1932. Among the first acts of Mr. Williams was to file a petition in the Orphans' Court of Harford County, on behalf of George L. Hopper as "sole distributee and heir," wherein various loans made the deceased, and the collateral pledged to secure the same, were set forth; it was there recited that many of these loans had matured, and it was important that the same be refinanced to protect the collateral. In part, the petition states: "Your petitioner shows further that as heretofore stated, the said collateral is valuable, and that in addition to the number of shares of stock pledged, there are * * * shares now in the hands of said administrators unpledged, and that it is for his interest as sole distributee and heir of said estate that said loans should be refinanced, and for that purpose he and the said administrators should be permitted to use the said shares of said stock to raise the money by new loans to take up and retire the said loans now outstanding and unpaid as aforesaid, and to pledge said unpledged stock and to repledge the said pledged stock for the said purpose. Your petitioner further shows that in refinancing as aforesaid, it is entirely practicable to preserve the identity of said loans, so that there will be no difficulty in passing the final account of said administrators in this Court, and that your petitioner is will-

ing to pledge his own credit in aid of said refinancing." Upon that petition, leave to refinance the several loans and pledge the securities was granted, as prayed, by an order passed on August 28th, 1917.

Following the aforegoing petition and order, we find in the record a second petition filed by Mr. Williams on behalf of the administrators, in which it is set forth that after the passage of the order of August 28th, 1917, the petitioners borrowed $25,000 from the Jarrettsville Building Association, with which they refinanced the various loans mentioned in their first petition, pledging the ice company stock as security; and that George L. Hopper had agreed to mortgage the real estate which had descended to him, as additional security for the loan. It is further stated that the plan of refinancing the estate had been aided through the appointment of Mr. Williams as trustee to sell the real estate of the decedent, under a decree of the Circuit Court for Harford County, in equity, passed in a creditors' proceeding; that a number of lots belonging to the estate had been then sold, from which the trustee had realized over $30,000; the trustee being willing that the proceeds of sales be applied to the payment of the building association debt, provided the stock pledged for the same be held by him to protect him from loss by reason of such application. The petition further alleges: "That in addition to the loans secured by said stocks, there were and still are some loans for which their said decedent and another are still liable, the payment of which was secured by the collateral of bonds of the Havre de Grace Gas Company. That for the purpose of refinancing the said loans so secured by gas bonds, and making it practicable to proceed with the settlement of the personal estate, your petitioners deem it wise to use fifty shares (50) of the preferred stock of the Independent Ice Company, inasmuch as with said collateral and the willingness of your petitioner, George, to assume said obligations individually, your petitioners have reason to believe that the liability of their decedent will be released, and it will enable them to pass another

account of their decedent's personal estate. In procuring said refinancing the said gas bonds, at present collateral to said existing loans, will have to be used with said Ice stock as collateral to said new loan or loans. Your petitioners therefore pray that your Honors will pass an order authorizing and empowering them as follows, that is to say:—1. To refinance the loans for which their decedent was liable jointly with another; 2. To use fifty (50) shares of Independent Ice Company stock as a pledge for the repayment of any new loan made necessary in such refinancing, and for which your petitioner, George L. Hopper, is to become liable individually instead of the estate of said decedent; 3. To use the decedent's interest in said gas bonds, namely an undivided one-half interest, by repledging them for such new loan or loans." And upon the latter petition leave was granted as prayed, by an order of the orphans' court passed on March 17th, 1923.

. In line with the design of the aforegoing petition and order, the indebtedness to the Harford Bank was refinanced; the bank accepting the joint notes of George L. Hopper and Hopkins, retaining the gas bonds it then held as collateral, and securing as additional collateral ten shares of the preferred stock of the Independent Ice Company. In the creditors' proceeding in which Mr. Williams was appointed trustee, the attorney himself was the complaining creditor; and the defendants, the heir at law and the administrators, filed separate answers, in which they admitted the allegations of the bill of complaint and consented to the passage of the decree. The decree was passed on March 16th, 1918; and, acting under it, Mr. Williams, during a period of fourteen years, effected a number of sales, the total proceeds of which approximated the sum of $32,615. Nearly all of these proceeds were disbursed by the trustee, with the approval of the heir at law, toward the common cause of paying the obligations of the estate, and yet, during this long period, the record does not show that the Harford Bank was heard to complain. As a matter of fact, the Harford Bank

renewed the original obligations of Peter Lesley Hopper and Hopkins in the early course of the administration of the estate, by accepting the notes of George L. Hopper and Hopkins, which latter notes were secured by the collateral of the gas bonds originally held by it, and were further secured by the additional collateral of ten shares of preferred stock of the Independent Ice Company appraised at the sum of $850. The pledge of the ice company stock as additional security for this indebtedness was made under the authority of the Orphans' Court of Harford County, and, in effect, took from the general assets pertaining to the estate a part of its securities for the specific purpose of giving the bank additional security for the new loan. It seems clear to us that at the time the new loan was made to Hopkins and George L. Hopper in his individual capacity, for the very purpose of taking care of the former indebtedness of Hopkins and Peter Lesley Hopper, the bank intended the new loan to take the place of the old one. As evidence of this fact, it renewed the indebtedness from time to time, over a long period of years; it collected interest upon its renewals, from the new promisors, and it carried the substituted indebtedness on its books as a different transaction, with additional security. It is true, it retained the original notes of Peter Lesley Hopper and Hopkins, but nothing was ever credited upon them, in the form of interest or otherwise, and nothing was done seeking their collection, besides filing them against the estate of the deceased in the early stages of its administration, until February 10th, 1933. On October 2nd, 1931, the assumed indebtedness, plus the sum of $600, which represented an additional loan made in 1928 by the bank to George L. Hopper and Hopkins, amounted to $5,600, and was then evidenced by two notes signed by George L. Hopper and Hopkins, which the makers refused to renew. These notes were carried by the bank as overdue paper, until June 8th, 1932, when a judgment was entered upon them for $5,832, with attorneys' fees and costs added. Meanwhile the bank negotiated loans to George L. Hop-

per on his single paper, and further loans to George L. Hopper on notes signed by himself and Bernice M. Hopper his wife; and upon these latter loans judgments were entered by confession, under the authority of the powers contained in the notes, on September 30th, 1931, for $4,780.70, with attorneys' fee and costs, against George L. Hopper, and for $2,440.95, with attorneys' fees and costs, against George L. Hopper and Bernice M. Hopper, his wife, respectively. On February 10th, 1933, the Harford Bank for the first time indicated its intention to hold the estate of Peter L. Hopper on the aforegoing judgments, by filing its petition in the original creditors' proceeding, wherein Mr. Williams had been appointed trustee for the sale of the real estate, alleging the indebtedness and seeking to have the substituted trustee constituted a receiver for the purpose of collecting the rents and income accruing from the then unsold real estate, and applying the same to taxes and insurance on, and maintenance of, said property, as far as necessary, until sold. Following this action, on June 5th, 1934, the bank filed a claim against the estate in the sum of $15,549.85, in support of which it exhibited and filed the three original promissory notes of Hopkins and the decedent, bearing the stamped notation to the effect that they had been filed in the Orphans' Court of Harford County on or about the 21st day of August, 1917; and, in further support of said claim, it filed the three judgments hereinbefore set forth.

We have detailed the several items, and their respective history, which make up the present claim of the bank as against th remaining assets of the estate, without, however, drawing a line of distinction between the bank's claim for $5,832 (with interest, costs, and attorneys' fees) allegedly based on the original indebtedness of Peter L. Hopper and Hopkins, and in which the independent loan of $600 to Hopkins and George L. Hopper is included, and its claims for $4,780.70 and $2,440.95 (with interest, costs, and attorneys' fees) representing independent indebtedness contracted respectively by George L. Hopper,

and George L. and Bernice M. Hopper, upon their promissory notes discounted by the bank subsequent to the death of Peter L. Hopper, all of which are now represented in judgment form, and which the bank is seeking to enforce against the estate.

As to the two latter judgments, representing loans made by the bank to George L. Hopper, and George L. and Bernice M. Hopper, upon their respective notes, after the death of Peter Lesley Hopper, it is urged on behalf of the bank that the same are just claims against the estate, because the money was borrowed for the purposes of the estate. It is impossible to determine every item, from these loans, which was used for the purposes of the estate, but it is argued that a considerable part of the money so borrowed was applied to taxes, insurance, and maintenance; that some of it was used in paying off original claims against the estate, and that accordingly, as to this latter indebtedness, the bank should be subrogated to rights as a creditor of the estate. On the contrary, it is shown that throughout the period of George L. Hopper's administration, which has continued until now, he has collected the rents and income from both realty and personalty, amounting to $70,039.32, as follows: Dividends, ice company stock, $29,666; interest on Havre de Grace gas bonds, $8,750; rents from real estate (net), $27,623.32; stock dividends, 36 shares Independent Ice Company common stock, $4,000. It therefore follows that the administrators, in the course of their administration, had the benefit of a substantial income, which, properly applied, would seem sufficient to meet the ordinary demands of the creditors, and the carrying charges of the estate. Especially is this evident when it is shown that more than $32,000 net, representing the proceeds of real estate, was available.

In *Milholland v. Tiffany*, 64 Md. 455, 460, 2 A. 831, 834, it is said: "The law of substitution is not founded on contract or agreement, but upon the equitable powers of the court. It is in the nature of equitable relief to protect a meritorious creditor who has paid the debt of

another against loss and damage. We say 'meritorious,' because it will not be applied in behalf of a mere stranger who officiously meddles with a matter which in no manner concerns him. In most cases it is applied in behalf of one who was under an obligation of some kind to pay the debt of another as a surety, who is obliged to pay the debt of his principal, or one who is obliged to pay a lien or incumbrance on property purchased by him. But it is not necessarily confined to these cases; but may be applied, on equitable principles, in behalf of one who, at the instance and request of the debtor, pays a lien or incumbrance which he was under no legal obligation to pay, provided he does not interfere with intervening rights and incumbrances."

Along the same line of reasoning, in the case of *Aetna Life Ins. Co. v. Middleport*, 124 U. S. 534, 8 S. Ct. 625, 629, 31 L. Ed. 537, the court, after observing that the doctrine of subrogation is derived from the civil law, quotes with unqualified approval *Sheldon on Subrogation*, secs. 2, 3, and 240, as follows: "It is said to be a legal fiction, by force of which an obligation extinguished by a payment made by a third person is treated as still subsisting for the benefit of this third person, so that by means of its one creditor is substituted to the rights, remedies, and securities of another. * * * It takes place for the benefit of a person who, being himself a creditor, pays another creditor whose debt is preferred to his by reason of privileges or mortgages, being obliged to make the payment, either as standing in the situation of a surety, or that he may remove a prior incumbrance from the property on which he relies to secure his payment. Subrogation, as a matter of right, independently of agreement, takes place only for the benefit of insurers; or of one who, being himself a creditor, has satisfied the lien of a prior creditor; or for the benefit of a purchaser who has extinguished an incumbrance upon the estate which he has purchased; or of a co-obligor or surety who has paid the debt which ought, in whole or in part, to have been met by another. * * * The doctrine of sub-

rogation is not applied for the mere stranger or volunteer who has paid the debt of another without any assignment or agreement for subrogation, without being under any legal obligation to make the payment, and without being compelled to do so for the preservation of any rights or property of his own."

And in 25 *R.C.L.* 1342 the principle of subrogation is further enunciated as follows: "One advancing money to an executor or administrator which is applied to the payment of debts for which the estate is bound may be subrogated to the place of the executor or administrator. But reason, as well as sound policy, requires that it should be shown by the clearest evidence that the estate has been benefited, or, in other words, that the money has been applied benefically and in the payment of the debts."

To the same effect, in 60 *C. J.* 716, it is said: "The payor must have acted on compulsion, and it is only in cases where the person paying the debt of another will be liable in the event of a default, or is compelled to pay in order to protect his own interests, or by virtue of legal process, that equity substitutes him in the place of the creditor without any agreement to that effect; in other cases the debt is absolutely extinguished."

After observing the distinction between the case of *Milholland v. Tiffany, supra,* wherein the payment was by the person claiming the subrogation to the creditor, and the instant case, wherein the payment was to a third person, who, in turn, may have paid the creditor, and drawing the deduction that where the doctrine of subrogation would be applicable if the subrogee itself paid the debt, there would seem no valid reason why it should not apply in cases where it furnished the money to the debtor for the purpose of having him pay it, the chancellors below conclude as follows: "Applying these principles to the facts to this case, we cannot accept the contention that the bank is entitled to be subrogated to the rights of creditors whose claims were paid from the proceeds of the notes given by George L. Hopper, and by him and Bernice M. Hopper, except to the extent that the proceeds of such

loans were used and intended to be used to pay taxes legally assessed and levied on assets of the estate held by the bank as security for loans either on those notes or on the Hopper and Hopkins notes. While the doctrine may be extended, as stated in *Milholland v. Tiffany*, to cases where one pays a lien or an incumbrance which he was under no legal obligation to pay, when the payment is at the instance and request of the debtor, it certainly cannot be extended beyond that. In this case the payment was not made by the bank to any creditor but to the makers of the notes, and while George may have paid creditors out of the proceeds of the notes, he was under no legal compulsion to do so, nor was there proof of any understanding or agreement between the makers and the bank that the money would be so applied. * * * The bank had no relations of any kind with the administrators nor with the creditors of the estate in respect to these notes; their relations were with George and Bernice Hopper personally. If it be assumed that they could be subrogated to the rights of any one, it would be to the rights of the administrators, or as the subrogee of subrogees. But George Hopper would not be entitled to subrogation until he showed that the assets of the estate, together with the income he had collected from it, were not sufficient to pay the claims against it, and that he has not done. But apart from all that, it is manifest from the record that when the bank dealt with George Hopper and Bernice Hopper it had no agreement or undertaking that it was to have any rights as a subrogee, but on the contrary, if it is chargeable with any knowledge, it is that the purpose of the loans was to substitute the obligations of George and Bernice for obligations of the estate in order that the estate might be released from such obligations and the obligations discharged, and that the estate collateral could have been pledged on no other theory. It would be strange if the estate could be stripped of the collateral to discharge its debts, and after it had lost the collateral still be liable for the debts, and liable, too, to

the very person who had taken the collateral to discharge its debts."

We concur in the conclusion, and the reasoning therefor, of the court below, as above expressed, except, however, as to that part thereof which applies the doctrine to whatever amount of the proceeds of such loans as was used or intended to be used to pay taxes legally assessed and levied on assets of the estate held by the bank as security for any of its loans. In this respect we do not concur, for the following reasons: (a) The bank has failed to establish the facts necessary to show subrogation, and has therefore not discharged its burden of establishing such right to relief. 60 *C. J.* 835, sec. 139. (b) There was no agreement that the bank should be substituted for the creditors whose claims had been discharged by the money furnished by the bank, and therefore no conventional subrogation. (c) At the times of the several loans made by the bank on the notes of George L. Hopper alone, and George L. and Bernice M. Hopper (and it may be added, the notes of George L. Hopper and Hopkins) the securities of the deceased had been duly assigned to George L. Hopper as absolute owner, in consideration of the release of the estate from corresponding liability. This being the fact, and there being no liability of the estate to pay taxes on securities with which it had parted, it follows that no subrogation arises. It is our opinion, therefore, that the doctrine of subrogation does not apply to any of the indebtedness evidenced by the three judgments now filed as claims against the estate, and that, to the extent to which the doctrine was applied by the lower court, the decree appealed from was erroneous.

Returning now to the judgment for $5,832, which the bank claims is represented by the original indebtedness of Peter L. Hopper and Hopkins, but which, nevertheless, embraces an independent loan of $600 made to George L. Hopper and Hopkins, it is asserted by the administrators, and denied by the bank, that there was a novation, and that the estate is not now and never was under any

obligation to pay the notes given in substitution for the notes signed by Peter L. Hopper and Hopkins prior to the former's death. It is earnestly urged by the appellee that various petitions, prepared and filed by Mr. Williams, acting in his capacity as counsel for the administrators in the administration of the estate, are binding upon the bank because of the fact that at the same time he was its president and counsel. We do not determine that, standing alone, the official position of Mr. Williams as executive head of the bank and as its counsel would in every transaction bind the bank. The general principle is that if, within the scope of his office, the president of a bank has knowledge of a fact which it is his duty to declare, and not to his interest to conceal, then such knowledge is to be treated as that of the bank, for the reason that he is then presumed to have done what he ought to have done, and to have actually given the information to his principal. But it does not follow that in every instance transactions of a president or counsel of a bank, relating to matters pertaining to his transactions with clients, or to transactions in which he is personally interested, of which the directors and other officials of the bank have no knowledge, would under all circumstances bind it. *American Nat. Bank of Nashville v. Miller*, 229 U. S. 517, 33 S. Ct. 883, 57 L. Ed. 1310. In *Amer. Law Inst., Agency*, sec. 279, it is said: "If in the particular transaction, the person who has knowledge, although an agent in other matters, is not acting nor purporting to act on account of the principal, but is acting for himself or for some other person, the principal is not affected by such knowledge." It can readily be conceived that an attorney occupying the standing and official relationships which were occupied by Mr. Williams may have had many transactions with his clients which it was not to his interest in any manner to conceal, but which, nevertheless, directly or indirectly affected the interests of the bank of which he was president; and this, too, without any knowledge on the part of the board of directors and

cashier, who, in the last analysis, constitute the true governing influences in the direction of the policy of the bank. In the instant case, however, the responsibility of the bank for the action which Mr. Williams may have taken is not confined to his activities alone. On the other hand, it is definitely shown that the transaction with reference to refinancing the original indebtedness of Peter L. Hopper was clearly known to officers of the bank other than Mr. Williams; that new notes were taken in place of the original notes of Peter L. Hopper, signed by George L. Hopper individually, and Hopkins; that in negotiating this new loan, security other than what the bank held at the time of the death of Peter L. Hopper was required, or at least accepted, by the bank, which additional security was taken from the general assets of the estate and definitely appropriated to the security of the bank, to the corresponding detriment of the general creditors of the estate. Furthermore, in the subsequent renewals, additional money was loaned, and included in the new notes. There is no better evidence of the fact that the bank participated in this loan, entirely independent of what seems to have been the general plan of refinancing the estate in the mind of Mr. Williams, than is found in a letter from the cashier of the bank directed to J. T. C. Hopkins, Jr., one of the original joint obligors, dated June 16th, 1923, as follows: "We have yours of June 14th enclosing check for $366.55 and certificate No. 124 for ten shares of The Independent Ice Company of Baltimore City stock, also yours and George Hopper's note for $5,000.00 to take up note of yourself and George L. Hopper for $4,000.00 and yours and George L. Hopper's note for $1,300.00 and we herewith enclose the old note. We have delivered Bond No. 93 of the Havre de Grace Gas Company to the Second National Bank of Bel Air as requested. This bond has a coupon attached due March, 1923, for $12.50. We have asked the Second National Bank to acknowledge receipt of this bond direct to you."

It will thus be seen, regardless of the connection of Mr. Williams with the bank, that, through its cashier, it

returned a part of its original security; accepted, as hereinbefore noted, additional and extrinsic security, and by every inference treated the transaction as a novation of the original indebtedness. It is but fair to presume that in addition to the knowledge of such transaction on the part of the cashier, the same must have been brought home to the directors or other governing body of the bank. In *District Nat. Bank of Washington v. Mordecai,* 133 Md. 419, 427, 105 A. 586, 588, it is said: "A 'novation' is a new contractual relation, and contains four essential requisites: (1) A previous valid obligation; (2) the agreement of all the parties to the new contract; (3) the validity of such new contract; and (4) the extinguishment of the old contract, by the substitution for it of the new one. 29 *Cyc.* 1130. Also, *Pope v. Vajen,* 121 Ind. 317, 22 N. E. 308, 6 L. R. A. 688, and the cases there cited." Neither the validity of the existing obligation, consisting of the judgments upon which the claim of the bank is based, nor the validity of the original obligation of Peter L. Hopper and Hopkins, has been assailed; and therefore, the only other requisites necessary to support the principle of novation in this case are: (1) The agreement of all the parties to the new contract; and (2) the extinguishment of the old contract by the substitution for it of the new one. It is a well stated principle that novation is never presumed, and that the intention of the obligor that the existing debt should be discharged by the new obligation must be concurred in by both debtor and creditor. Few cases are conceivable in which the question of novation *vel non* can arise where the agreement of all the parties to the new contract is evidenced in writing; and, in general, it must follow that a conclusion as to such an agreement must be reached from a careful review of all transactions pertaining to the particular case under consideration. Again, in reaching a conclusion that the parties intended the extinguishment of the old contract by the substitution of a new one, the court must be guided by the same course. Reviewing the facts and circumstances

in the case before us, there is but one element upon which the theory of novation can be defeated, and that element exists in the single fact that the original notes of the decedent and Hopkins remained in the possession of the bank. But we cannot conclude that this fact alone can be construed to sufficiently support the contention of the bank, in view of the conflicting action on the part of the cashier of the bank, as well as the conclusive inference that Mr. Williams, its president, regarded the novation as being complete, as shown by the recitals in the various papers prepared and filed by him in the course of conducting the administration of the estate.

In the view we have taken of the case, and the bar of the general statute of limitations not being pressed, it becomes unnecessary to deal with the question of limitations in respect to the statutory bar supposed to be raised by Code, art. 93, sec. 109.

While not incumbent upon us, and without reflecting upon any one connected with the instant case, we cannot conclude this opinion without expressing our disapproval of the procedure followed in the administration of the estate involved. The practice in the orphans' court, of permitting securities pertaining to the estate to be assigned and pledged for individual loans of the sole heir at law, pending the process of administration, and the further practice, in the equity court, of permitting the funds accruing from sales made under its decree to be intermingled with funds pertaining to the personal estate, in all probability, as in the case before us, will lead to unfortunate complications and consequent litigation. In this connection, we need only refer to the fact that under the Constitution and laws of this state, orphans' courts and equity courts comprise entirely separate entities. Their duties are designed along different lines, and they should function in accordance with the true intent responsible for their respective creation.

Entertaining the views herein expressed, it follows that all of the claims of the bank, as against the estate of

Peter L. Hopper, are disallowed, and the decree appealed from reversed in part and affirmed in part.

> *Decree reversed in part, and affirmed in part, and cause remanded, to the end that a decree may be passed in accordance with this opinion, with costs to the appellee.*