DOMINION NATIONAL BANK et al. *v.* SUNDOWNER
JOINT VENTURE et al.

[No. 285, September Term, 1981.]

*Decided November 5, 1981.*

The cause was argued before MORTON, MASON and WILNER, JJ.

*Sally D. Adkins* and *Raymond S. Smethurst, Jr.,* with whom were *Adkins, Potts & Smethurst* on the brief, for appellants.

*William G. Duvall,* with whom were *David B. Douse* and *Webb, Burnett & Duvall* on the brief, for appellees.

WILNER, J., delivered the opinion of the Court.

On September 28, 1977, two actions were filed in the Circuit Court for Worcester County, each seeking judgment on a promissory note executed on behalf of an entity known as Sundowner Joint Venture (SJV). The defendants in each case were the same — SJV, alleged to be a general partnership, and twenty individuals and one corporation alleged to be the partners in the joint venture. In one case (No. 7264), the sole plaintiff was Dominion National Bank (Dominion); in the other (No. 7265), Dominion had two co-plaintiffs — John T. Hazel, Jr. and M. Charlotte Garner.

After an avalanche of pleadings, the court entered summary judgments in favor of the plaintiffs on the two notes. As to SJV, the judgments were in the amounts requested ($340,554 plus collection fee in No. 7264 and $399,104 plus collection fee in No. 7265), but with respect to the twenty-one partners sued individually, the judgments were several rather than joint, and were limited in each instance to their respective percentage shares of the joint venture. In most cases, this was five percent, or $17,027 in No. 7264 and $19,955 in No. 7265.[1] No one was happy with that result, and so we have cross-appeals.

The court reached its decision by finding, essentially, that (1) the notes were validly executed on behalf of the joint venture, (2) SJV was (and is) a general partnership, (3) the joint venture agreement, however, manifested an intent to limit the individual liability of the partners to their respective percentage shares, (4) on May 2, 1974, the parties entered into a novation, (5) at that time, the plaintiffs were

_____

1. Nineteen of the partners had a five percent interest; two had a two and one-half percent interest.

aware of those provisions in the joint venture agreement serving to limit the individual liability of the partners, and (6) as a result, the plaintiffs were deemed to have consented to such limitations and are bound by them.[2]

The plaintiffs — appellants here — concur with the court's conclusions that the joint venture is a general partnership and that the two notes were validly issued on its behalf. They argue, however, that (1) the May, 1974, agreement did not constitute a novation, and (2) the joint venture agreement does not and cannot serve to limit the individual liability of the partners for joint venture obligations to third parties. Cross-appellants — being SJV alone in No. 7264 and SJV and two of its partners (Charles Fulton and Murray's Leasing Co.) in No. 7265 [3] — contend that there was a genuine dispute of material fact as to whether the two notes were validly issued, and that the court erred in granting summary judgments in any amount. Beyond that, along with the other appellees, they argue that the court was correct in limiting the liability of the various partners.

The notes in question and the issues that they generate arise from a complex set of transactions involving the Sundowner Mobile Home Park, located in Ocean City.

It appears that in March, 1972, one Gerald Exten contracted to purchase the mobile home park from Kathleen Pokusa for $1.1 million. The actual conveyance, however, was made not to Exten but to a limited partnership known as Sundowner Limited Partnership (SLP), in which Exten was a general partner and in which William DiLoreta, M. Charlotte Garner, Phillip L. Green, and John T. Hazel, Jr. were limited partners. Settlement occurred in May, 1972.

---

2. These findings, we are told, were orally announced by the court at the conclusion of a hearing on the various motions; but unfortunately the reporter destroyed her notes of that hearing, and so there is no written evidence of those findings in the record. Although requested, the court declined to prepare a memorandum of its findings. As there does not appear to be any dispute that the findings were made, we shall assume that they were made and that they formed the basis of the court's ultimate decision.

3. During the course of the litigation and the pendency of the appeal, settlements were reached with some of the partners.

Shortly thereafter, Exten interested a number of investors in purchasing the mobile home park on a leaseback arrangement. To that end, the following transactions occurred:

(1) On August 29, 1972, an Agreement of Sale was apparently executed in which SLP agreed to sell the property to Gene A. Murray and John M. Fitzgerald as trustees or agents for an entity to be formed. Unfortunately, the parties have not reproduced the Agreement in the record extract (and we are not disposed to search through a ten-volume record to look for it), and we are therefore not privy to all of its terms. On the same day, a lease was entered into between "Gene A. Murray and John M. Fitzgerald, and/or assigns, Lessor" and Exten Associates, Inc., Lessee, in which the corporate lessee leased the Sundowner Mobile Home Park for a period of twenty years, commencing January 15, 1973, at a rental of $150,000 a year plus annual escalations of 2% after the first year. Murray and Fitzgerald each signed the lease as "trustee."

(2) On February 6, 1973, SJV was created by means of the Sundowner Joint Venture Agreement.[4] The agreement recited that the purpose of the joint venture was to acquire and own certain described land, upon which the mobile home park was located. It appointed Murray and Fitzgerald as trustees for the joint venture and its members and authorized them to enter into a contract with SLP to acquire the property "under the terms and conditions set forth in an Agreement of Sale, the terms and provisions of which the Venturers are familiar." It further authorized the trustees to pay $1,800,000 for the property, as follows: $360,000 in cash; assumption of an existing first mortgage of $815,000 to Kathleen Pokusa; and execution of a second mortgage for the balance of $625,000 to SLP. In order to carry out their duties, the trustees were empowered to execute "such Contracts, Deeds, Mortgages, Bills Obliga-

---

4. The Joint Venture Agreement is dated November 6, 1972, but, in paragraph 3, it provides that the term of the joint venture shall commence "immediately after all the Parties hereto shall have signed this document." The document reflects that the last parties signed it on February 6, 1973.

tory or other documents that may be required by law, and to do such acts and deeds which are necessary and proper to promote to [*sic*] the trust and the interest of the parties to the Joint Venture."

Paragraph 4 of the joint venture agreement, captioned "CAPITAL," listed the names and addresses of the twenty-one co-venturers and the percentage of interest held by each. It recited that each had contributed the percentage amount shown after his name, "which percentage shall represent his proportionate interest in the Joint Venture and its assets *and his proportionate liability for the obligations of the Joint Venture.*" (Emphasis supplied.) Paragraph 5 obligated the venturers, upon call, to contribute "pro rata" such additional capital as necessary to pay "all current or due obligations of the Joint Venture..."; and paragraph 6 provided that net profits shall be divided and net losses shall be borne by the venturers "in the percentages set forth in paragraph 4 hereof."

(3) On February 1, 1973, settlement took place. The property was conveyed by SLP to Murray and Fitzgerald as trustees for SJV,[5] and, on behalf of SJV, they executed the two notes at issue here, each for $312,500, and a mortgage securing the same. In accordance with the joint venture agreement (and presumably the agreement of sale), the notes called for interest only for the first five years, with annual principal amortization to commence in the sixth year (1979) and continue until 1998 when the final installment would be due. Each note contained an "acceleration" clause, to the effect that a default in the payment of any installment of principal or interest would cause "the entire balance due hereunder to become immediately due and demandable...."

There is nothing in the record to show that the August, 1972, lease with Exten Associates was ever assigned to

---

5. One of the many professional lapses revealed by this record is the fact that settlement occurred before SJV was legally in existence. As noted, the joint venture did not become effective until February 6, 1973. No one has raised the question — either in the trial court or on appeal — of the effect of that lapse and we shall not further complicate this already complicated case by considering it. Maryland Rules 1031 and 1085.

SJV, but we are told by appellants (without contradiction by appellees) that such an assignment was made. A more serious lapse was the fact that an existing mortgage on the property payable to the Hebron Savings Bank (Hebron) in an amount somewhere between $120,000 and $200,000 — the record is not clear on the matter — was not paid at settlement, as it should have been; and it thus remained as a first lien on the property. That, indeed, is one basis of cross-appellants' claim that the trustees exceeded their authority in the transaction.

In March, 1973, SLP assigned one of the notes (that involved in No. 7264) to Exten who, in turn, endorsed and delivered it to Potomac Bank and Trust Co., the predecessor of appellant Dominion. At some point, not clear from the record, SLP assigned the other note to William DiLoreta as trustee for the four SLP limited partners — himself, Phillip Green, John T. Hazel, Jr., and M. Charlotte Garner. Eventually, Hazel and Garner became the sole beneficial owners of that note, and on December 10, 1976, they caused it to be endorsed by DiLoreta (as trustee) to Potomac Bank and Trust Co. as collateral security for certain obligations owing to the bank. The assignments of the notes to Exten and DiLoreta, respectively, were in distribution of the various partners' shares in SLP. Dominion, as Potomac's successor by merger, claims to be a holder in due course of both notes.

Some time in 1974, after the assignment of the first note to Potomac but before assignment to it of the second, Exten Associates became in default of its obligation under the lease, and suit was filed against it. Perhaps as a result of that default, SJV fell into default on both the Pokusa and SLP mortgages. In an effort to resolve the various difficulties, SJV, Exten Associates, SLP, Exten individually, and Potomac entered into a new agreement on May 2, 1974.

The agreement recited some of the above history and provided, in relevant part, for the following:

(1) The current arrearage due by Exten Associates on the lease was established as $140,267.

(2) Exten Associates agreed to discharge that arrearage by (1) servicing the Hebron mortgage, for which credit of $85,714 would be allowed, (ii) making a $50,000 interest payment on SJV's behalf on the Pokusa mortgage, and (iii) delivering a promissory note in the amount of $4,613 to SJV's attorney.[6]

(3) SJV agreed to dismiss the pending action against Exten Associates, without prejudice to reinstitute it if Exten Associates defaulted on its obligations under the new agreement. However, said the agreement, "nothing herein contained shall be deemed a waiver by SJV of its underlying entitlements, rights and privileges under the Lease. . . ."

(4) SJV, SLP, and Potomac agreed to four modifications in the SLP mortgage (and the two notes secured by it); namely: (i) the term was reduced by thirteen years — from 1998 to 1985; (ii) the date of annual payment was changed from February 1 to April 1; (iii) any "advances" made by Potomac, SLP, or SLP partners "to secure the obligations of SJV" would be considered as additional principal under the SLP mortgage; and (iv) SJV would be entitled to set off against the SLP mortgage any payments due under the agreement from Exten Associates if not paid.

(5) SJV agreed to assume the Hebron and Pokusa mortgages and to indemnify "them" against all loss and expense incurred by reason of SJV's failure to "perform said mortgages," provided that "all of the obligations of this Agreement are faithfully performed by them." [7] Exten Associates, on the other hand, agreed to indemnify SJV from any loss or expense arising from its failure to service the Hebron mortgage.

(6) SJV agreed to deliver all of its receipts not needed for "ordinary operating expenses" to SLP's attorney, who would

---

**6.** There seems to be a $60 discrepancy in these figures that is not explained in the agreement or the record: $85,714 plus $50,000 plus $4,613 equals $140,327.

**7.** The agreement does not make clear who is meant by "them" — Hebron and Pokusa or SLP and its partners.

pay them over to Potomac until such time as all interest due on the SLP mortgage was paid current.

(7) SLP agreed to advance, on Exten Associates' behalf, the $50,000 payment on the Pokusa mortgage (see paragraph (2) above). In the event of any default by Exten Associates of any of its obligations, SLP would be entitled to set off that $50,000 (or any unrepaid portion of it) against the SJV note for $312,500 that had been assigned to Gerald Exten (and reassigned by him to Potomac).

(8) Finally, under the caption "INTERPRETATION," the agreement stated that it "shall be deemed to be the entire agreement of the parties *on the subjects covered herein,* supplanting upon its execution any and all *inconsistent* provisions of prior agreements oral or written. . . ." (Emphasis supplied.)

The agreement recites that Potomac "joins herein for the sole purpose of and does hereby consent to the provisions hereof pertaining to Potomac and for no other purpose" — not one of the better examples of English rhetoric or syntax.

The 1974 agreement did not entirely resolve the financial difficulties. Two years later, in May, 1976, SJV entered into a new agreement with Hazel which made certain additional modifications pertaining to the second SJV note. At the time, the interest payments due on the note for February, 1975, and 1976, had not been paid. It was agreed that (1) the annual payment date would be switched to August 1; (2) upon payment of the interest due August 1, 1976 ($21,875), Hazel agreed to waive a like amount of delinquent interest, leaving a net amount of delinquent interest of $10,937; (3) that $10,937 would be paid in three annual installments beginning August 1, 1977; (4) any right of set-off accruing to SJV for payments on the Hebron mortgage would not apply with respect to the second note; and (5) any future advances made by Hazel on SJV's behalf would be secured by the SLP mortgage.

The problems continued, the notes again fell into default, and eventually this litigation ensued.

Because some of the questions raised by appellants and cross-appellants overlap, we shall consider the issues before us in a somewhat different order than presented in the briefs.

### (1) *Cross-Appellants' Affirmative Defenses — Authority of Trustees and Fraud*

Cross-appellants argue that the joint venture agreement authorized the trustees — Murray and Fitzgerald — to acquire the property for $1,800,000, and to pay for it with $360,000 in cash, the assumption of the $815,000 Pokusa mortgage, and execution of a second mortgage for $625,000. By accepting the property subject to the Hebron mortgage, the trustees "clearly acted beyond the scope of their authority," we are told. Thus, say cross-appellants, "the notes given are not the obligations of the participants in the venture, other than the trustees who signed them. . . ."

Appelants/cross-appellees respond with the assertion that that issue was not raised below and that we should therefore take no notice of it. Although the answer filed in response to appellants' motion for summary judgment does not mention this argument specifically, we observe that in their answer to interrogatory No. 9, which formed part of the record on summary judgment, cross-appellants did make this very contention.[8] It therefore was before the lower court and was implicitly decided in the granting of appellants' motion,

---

8. Interrogatory No. 9 asked, "[i]f you contend that John M. Fitzgerald and Gene A. Murray, as trustees for the Sundowner Joint Venture, exceeded their authority in executing the Sundowner Note, state in detail all facts and specify all provisions of the Sundowner Joint Venture Agreement which you rely upon to support this contention." Cross-appellants' answer in relevant part, was:

"... Additionally, the Sundowner Joint Venture Agreement specifically limited the authority of the Trustees to create or assume debt; the settlement of the sale of the mobile home part [*sic*] from Sundowner Limited Partnership to Sundowner Joint Venture was conducted and consummated without paying off a mortgage to Hebron Bank, and the act of said Trustees in consummating or permitting the consummation of the transaction without retiring the debt was beyond the authority of such Trustees."

and it is therefore incumbent upon us to address it. Cross-appellants' procedural victory is a hollow one, however, for we find no merit in their argument.

There is nothing in the record to indicate why the Hebron mortgage was not paid or released at the February, 1973, settlement. There is no evidence in the record, however, to show that SLP or its partners (much less Potomac or Dominion) were either aware that the mortgage was not released at that time or had anything to do with it not being paid or released. Nor is there any evidence to show that the trustees were aware that the Hebron mortgage (1) existed or (2) was not released. Cross-appellants have not included the settlement sheet, any title examination reports, the agreement of sale, or any other relevant evidence bearing on the matter in the record extract.

The joint venture agreement (which fifteen of the twenty-one venturers signed and acknowledged five days *after* the settlement) called for SLP to receive a note or notes totaling $625,000, and a mortgage securing the same; and the trustees clearly were authorized to execute those documents, which is what they did. Absent some evidence of knowledge or complicity by someone — SLP or the trustees — the failure of the trustees to ensure that the settlement officer obtained and recorded a release of the Hebron mortgage (which may have amounted to negligence, rendering them answerable to their co-venturers) would not suffice to make the notes *ultra vires* in derogation of the specific authority they had to sign them.[9]

Cross-appellants' claim of fraud is based on the assertion that the joint venturers intended that their liability was to be a limited and several one, as expressed in paragraph 4 of the joint venture agreement, and that if the notes are construed to create a joint and full liability, they were not the

---

9. In one sentence in their brief, cross-appellants also contend that, if the notes are effective to create a joint liability among the partners, the trustees exceeded their authority in signing them in light of paragraph 4 of the joint venture agreement. That issue, couched in terms of the trustees' authority and the underlying validity of the notes, was not raised below, and we shall therefore not consider it in this appeal. Maryland Rule 1085. *See, however, infra.*

kind of obligations intended to be assumed. That may or may not be true, but, regardless, it does not amount to the type of fraud which will serve to vitiate the notes. There is nothing in the record to show that SLP, much less Potomac or Dominion, was even aware of the terms of the (proposed) joint venture agreement when the 1973 settlement occurred and the notes were issued, or that they did or said anything to defraud the SJV joint venturers.[10]

## (2) *Appellants' Contentions*

The theory of appellants' claims against the twenty-one co-venturers is simple. They argue that SJV is a general partnership and that the partners are therefore jointly liable on the partnership obligations in accordance with normal partnership law.

Relying primarily on a caveat to that proposition exponded in *Union Trust Co. v. Poor & Alexander, Inc.,* 168 Md. 400 (1935), and *Demas v. Convention Motor Inns,* 232 S.E.2d 724 (S.C. 1977), appellees argue that, even if SJV is a general partnership (which they contest), it is permissible for the partners to limit their liability by contract, and if a creditor extends credit with knowledge of that limitation, he is bound by it. This, they claim (and the court below found), is what occurred here. SLP, Exten, Hazel, Garner, and Potomac had *constructive* notice of the joint venture agreement when the notes were assigned to Potomac in 1973 because the agreement had already been placed on record, and Potomac had *actual* knowledge of the joint venture agreement when it entered into the May, 1974, agreement which, appellees assert, was a novation.

What we have to determine here is whether the court below was correct in deciding, on summary judgment, that (1) SJV is a general partnership and not some other form of entity which might serve to limit the individual liability of

---

**10.** Cross-appellants point to an affidavit of one of the co-venturers, David Blakeman, as evidencing "that the entire transaction, from its inception, was imbued with fraud." We see no such evidence in that affidavit.

the co-venturers, and (2) if SJV is a general partnership, the joint venture agreement nevertheless manifested a clear intent to limit individual liability and appellants or their predecessors extended credit with sufficient knowledge of that limitation to make applicable the principles enunciated in *Union Trust Co.* and *Demas.*

### (a) *Nature of SJV*

Appellees contend that there was sufficient evidence in the record to create at least a genuine dispute as to whether SJV is a general partnership. The only evidence they point to in that regard, aside from the joint venture agreement itself, are the affidavits of three of the co-venturers stating that it was their "understanding and intent" that their liability was to be a limited one. We find that insufficient.

The joint venture agreement clearly creates a partnership. *See Madison National Bank v. Newrath,* 261 Md. 321 (1971); *Geo. Bert. Cropper, Inc. v. Wisterco Investments, Inc.,* 284 Md. 601 (1979). At one point, the agreement itself refers to the venture as a "partnership business" (paragraph 14(a)). It does not comply with the statutory requirements for a limited partnership in that, among other things, it fails to designate and distinguish between general and limited partners (*see* Md. Code, Corp. and Assoc. article § 10-102), and thus cannot be said to have created a valid limited partnership. Moreover, the record shows that (1) in various documents and agreements prepared or entered into by SJV over the years, it is referred to as a "general partnership"; (2) the 1975 and 1976 Federal income tax returns — partnership returns — state that the partners are *not* limited partners; and (3) the attorney who drew the agreement, and who was also one of the co-venturers, stated in deposition testimony that the agreement was intended to create a general partnership. In light of all this, the "understanding and intent" of two or three venturers does not suffice to raise a genuine dispute of fact. As a matter of law, SJV is in the nature of a general partnership, to which general partnership law is, ordinarily, applicable.

### (b) *The Union Trust Co. - Demas Doctrine*

In *Union Trust Co.,* two corporations and seven individuals formed what they called an "investment trust" known as the Panda Company for the purpose of investing in securities. One of the venturers put up $5,000; the others each contributed $500. The agreement creating the "trust" provided that "[s]uch securities as are purchased from time to time will be hypothecated with some bank and loans made against said securities, it being expressly understood that no member will be obligated for any amount greater than the percentage of his investment bears to the total obligation to the bank." *Id.* at 403. One of the investors — Hundertmark — was elected Secretary-Treasurer of the "trust" and was authorized "to negotiate with the bank in the matter of loans, to sign such notes and documents as are required by the bank, to execute substitutions." *Id.* at 404.

Hundertmark apparently negotiated two loans from the Farmers' & Merchants' Bank on behalf of Panda, pledging securities as collateral. *At the time the loans were made and the notes executed,* Hundertmark furnished the bank with a copy of the agreement. At some point, the notes became in default, and the Union Trust Company — then the holder of the notes — sued the individual investors, who demurred to the declaration. The case reached the Court of Appeals on the bank's appeal from the sustaining of the demurrer.

The bank, contending that the "trust" was really a general partnership, asserted joint and several liability against the partners under principles of partnership law; the defendants, on the other hand, claimed that the respective rights of the parties (including Hundertmark's authority as agent to execute the notes) were fixed by the agreement. The Court accepted that argument, stating, at 168 Md. 405-06:

> "Assuming that the parties to the agreement had the capacity to execute it ... and that the bank knew of it... and that the notes were executed for the Panda Company by an agent acting under a defined and limited authority, *the extent of which was known to the bank when it accepted them,* the

relations between the bank and the defendants must be measured by the terms of the contract rather than by the general law of partnership." (Emphasis supplied.)

More particularly, the Court considered the question in terms of Hundertmark's authority as an agent. At page 406: ". . . [I]f the agent had no authority to bind the members of the partnership severally for the whole debt, *and the lender knew he had no such authority,* its want of power to make such a loan as was authorized by the agreement could not possibly have expanded the agent's authority beyond the limits of the agreement creating it, or vest in him a power expressly denied to him." (Emphasis supplied.) Thus, said the Court, it made no difference whether the entity — the Panda Company — was a general or a limited partnership; "the case turns upon the construction of the contract, to ascertain the limits of the agent's authority." *Id.* at 406.

The Court then examined the agreement and concluded that (1) the parties intended that their liability be several and not joint, and that it be limited to the proportion of their respective investments, and (2) Hundertmark's agency authority was similarly limited — that he was authorized to do no more than pledge their credit "to the ratio which the amount set opposite their respective names bore to any loans which he might negotiate. . . ." *Id.* at 407-08. That then led to the crux of the Court's decision: "if the authority of Hundertmark was expressly limited by the agreement, *and the bank knew of that limitation when it made the loan,* no citation of authority is needed to support the proposition that it is bound by it." (Emphasis supplied.) *Id.* at 408.

*Demas v. Convention Motor Inns* involved a construction mortgage given by a general partnership. The partnership agreement provided that the construction loan "shall create a personal liability upon each partner, jointly and severally, for the repayment of the entire amount of said loan or loans, except for the following partners [who were then named] who shall be only liable for their percentage shares." *Id.* at 726. At the time it extended credit, the mortgagee had

knowledge of the limitation pertaining to the six named partners and, in accordance therewith, "required personal endorsement of the note only by the four partners not named in the above exception." 232 S.E.2d at 726-27.

Although unwilling to regard the six named partners as "limited partners" in the sense of restricting their liability to the amount of their respective investments, the Court concluded that they would be liable on a deficiency judgment "*only* to the extent of their respective percentage shares in the partnership." (Emphasis in the original.) *Id.* at 727. That determination was based on the premise that a creditor may, if he chooses, accept the several rather than the joint and several obligation of partners.

Under partnership law, general partners are jointly liable for the contractual debts and obligations of the partnership (Md. Code, Corp. and Assoc. article, § 9-307; *Southland Corporation v. Shulman,* 331 F.Supp. 1024 (D. Md. 1971)); and, ordinarily, agreements among partners (other than in a limited partnership) to limit their liability are not binding on third parties dealing with the partnership. *See, for example, Shier v. Price,* 263 S.E.2d 466 (Ga.App. 1979); *Gardiner v. Gaither,* 329 P.2d 22 (Cal.App. 1958); *Filesi v. United States,* 352 F.2d 339 (4th Cir. 1965).

The point made in *Union Trust Co.* and *Demas (and see also Weaver v. Oliver,* 40 S.W.2d 984 (Tex.Civ.App. 1931)) is that where the third party *knows* of the limitation *and consents to it,* he has made a special type of contract. He has agreed, in effect, that he will not look to the joint liability of the partners for the full obligation, as the partnership law would otherwise entitle him to do, but to accept something less than that. In such a circumstance, his rights and remedies arise from and are limited by the special contract he has made; he is not entitled to the more favorable remedies flowing from the law of general partnership, which he has agreed to forsake.

*Union Trust Co.,* and the principles enunciated in it, though never cited since 1935, have never been overruled,

and thus apparently remain the law in Maryland. We therefore must consider whether the case is applicable — whether the requisite notice and consent existed here.

(c) *The Proper Interpretation of Paragraph 4*

As a preliminary matter, appellants argue that paragraph 4 of the joint venture agreement does not manifest an intent to limit the liability of the co-venturers with respect to joint venture obligations to their parties, and that it should not be given that effect. If that is true, of course, the *Union Trust Co.* doctrine never comes into play.

Appellants view paragraph 4 as being nothing more than an *inter sese* agreement respecting the contributions to be made by the co-venturers. In particular, they point to the testimony of the draftsman of the agreement — Mr. Kerbin — that he did not intend to limit the liability of the investors, and urge that they should not be held to any different interpretation.

We disagree. Paragraph 4 very clearly purports to limit the "proportionate liability [of each co-venturer] *for the obligations of the Joint Venture"* to "the percentage amount shown after his name. . . ." (Emphasis supplied.) That most certainly extends beyond the matter of annual contributions to the capital of the entity or the division of profits and losses (which is covered in paragraph 6). Under the "objective" theory of contract — *see Bernstein v. Kapneck,* 290 Md. 452 (1981) — where the language of the contract is clear, as this part of the joint venture agreement seems to us to be, the subjective intent of the parties is irrelevant. Thus, the fact that Mr. Kerbin may have intended to provide for joint and full liability would not suffice to change the meaning of the language actually used.

(d) *Notice to Obligees*

Concluding, as we have, that paragraph 4 does purport to limit the liability of the co-venturers on joint venture obligations, in much the same way as the Panda Company

agreement construed in *Union Trust Co.,* we then must consider the second aspect of that case: Keeping in mind the strict test to be applied in granting summary judgment, what does the record show was the state of knowledge and intent of the obligees and their assigns concerning the purported limitation of liability expressed in paragraph 4?

In the maze of transactions touching upon the two notes, only three have particular relevance in this regard: the settlement on February 1, 1973, when the notes were first issued; the assignment of the notes to Potomac in or about March, 1973; and the agreement of May, 1974 — the alleged novation.[11] We shall consider these in order.

### (i) *The February, 1973, Settlement*

As we have already noted, there is nothing in the record to indicate that, at the time of settlement, SLP or any of its partners or assigns had any actual knowledge of the SJV joint venture agreement or, in particular, the provisions of paragraph 4 thereof. The only evidence bearing on that is the deposition testimony of Hazel, who specifically denied having any such knowledge at that time.[12] Moreover, the joint venture agreement, as we have also already observed, did not even become effective until February 6, 1973, and it was not recorded until February 13. Obviously, there could be no constructive notice of it as of the date of settlement, which is when credit was extended to SJV.

### (ii) *Assignment to Appellants*

There is nothing in the record to indicate any actual knowledge on the part of Potomac of the terms of the joint venture agreement at the time it took, as collateral, the notes from Exten and DiLoreta. The bank officer who han-

---

11. No claim is made by appellees that the 1976 modifications had any effect on the validity of the notes or their respective liabilities thereon, and we shall therefore not consider that question.

12. Hazel stated that he did not review the joint venture agreement "until long after the sale was consummated to the joint venture."

dled the transactions, Marshall Groom, testified on deposition that, although he assumed that there was some sort of agreement creating SJV, he had not seen it and was not aware of its terms at or before the time the bank took an assignment of the notes. This was confirmed in part by Hazel's testimony that he did not recall discussing either with SLP or its partners or Mr. Groom the provisions of the joint venture agreement.

Appellees argue, however, that the agreement had been recorded by then and that the bank therefore had constructive notice of its terms. This constructive notice, they claim, arises not only from the recording of the agreement but also from the duty to inquire as to the authority of the two trustees — Murray and Fitzgerald — to execute the notes. Having actual knowledge that the notes were executed by trustees, say appellees, the bank had a duty to inquire as to their authority, and had it done so, it would have discovered the joint venture agreement and become cognizant of paragraph 4.

We agree with appellees that the joint venture agreement was properly recorded under Real Property article, § 3-102 (and possibly § 14-112),[13] and that, as a result, the Potomac bank had constructive notice of it. We do not agree, however, with their analysis of the effect of such constructive notice.

Constructive notice (or knowledge) is a legal fiction; it is a useful and perhaps a necessary fiction, but it is a fiction nevertheless. It presumes as fact that which is not fact, and it therefore has its limits.

In *Union Trust Co.* and *Demas,* the creditor had *actual knowledge* of the limitations on individual partner liability at the time it extended credit. That actual knowledge formed the basis of the Courts' ultimate conclusion that the creditor had assented to those limitations. Over and over again in *Union Trust Co.* the Court of Appeals stressed that its decision was based on the fact, or the hypothesis, that the extent

---

13. Appellants contend that those statutes do not authorize the recording of the joint venture agreement and thus afford no constructive notice of it. We disagree.

of the agent's authority "was *known* to the bank" when it accepted the notes (*id.* at 405), that the lender *"knew"* the agent had no authority to bind the partners jointly (*id.* at 406), and that "the bank *knew* of that limitation when it made the loan. . . ." *Id.* at 408. (Emphasis supplied.)

The Opinion in *Union Trust Co.* was precise and well-crafted, generally devoid of loose language and mixed terminology. We assume, therefore, that in using, throughout, the various tenses of the verb "know," the Court had in mind actual knowledge or "cognitive notice" — an actual awareness of the pertinent facts, and not a fictional or imputed notice. *See* 1 *Merrill on Notice* §§ 3, 4 (1952).

As we have pointed out, ordinarily a creditor dealing with a general partnership can safely assume that the partnership debt is backed by the joint liability of all the partners. The theory behind restricting him to something less than that by reason of a special contract is that he is a party to that special contract — that he has, in fact, knowingly and voluntarily agreed to its disadvantageous terms. That assent, and its volition, can readily be inferred when the creditor is actually aware of those terms and proceeds in accordance with them; but we will not infer that assent (and do not believe that *Union Trust Co.* requires us to do so) based upon an imputed notice when the facts demonstrate the absence of a real awareness. This is particularly true, we think, when, as here, the creditor merely takes the obligation from a third party as collateral for an existing debt, and does not extend new (or any) credit to the maker of the obligation.

We are not impressed with appellees' argument about the bank's duty to inquire as to the trustees' authority. Had the bank been extending credit directly to SJV, it may have had a greater interest in SJV's legal status and the authority of the trustees to execute the notes. The record shows, however, that its dealings were entirely with SLP and its partners, not with SJV. To impute the requisite cognitive notice based on a duty to inquire under that circumstance is simply not reasonable.

### (iii) *The May, 1974, Agreement*

Appellees' principal contention here is that Potomac was a party to the 1974 agreement and that, at that time, it had actual knowledge of the joint venture agreement. The new agreement, they contend, amounted to a novation, and thus to a new extension of credit. This, they say, brings them squarely within *Union Trust Co. - Demas*. Once again, we disagree.

The parties argue at great length over whether the new agreement did or did not satisfy all the tests for a novation, the heart of the controversy being whether the record shows "an agreement among the parties to extinguish the old obligation[s] and substitute a new one for it" *See I. W. Berman Properties v. Porter Brothers, Inc.,* 276 Md. 1, 7-8 (1975).[14] Appellees place undue emphasis on that issue. Whether the May, 1974 agreement does or does not rise to the status of a novation is not dispositive of the ultimate issue before us, for when we view that agreement in a proper perspective, it becomes clear that, whatever its nature or status, there simply was not the type of knowing consent on the part of Potomac, Hazel, or Garner to the limitations expressed in paragraph 4 of the joint venture agreement required by the doctrine of *Union Trust Co.;* and the trial court erred in concluding otherwise.

---

**14.** The most recent comprehensive restatement of the law on novations is contained in the *I.W. Berman* case. The essence of it, taken from *I.W. Berman,* 276 Md. 7, *et seq.,* is as follows:

"A 'novation' is a new contractual relation made with intent to extinguish a contract already in existence. It 'contains four essential requisites: (1) a previous valid obligation; (2) the agreement of all the parties to the new contracts; (3) the validity of such new contract, and (4) the extinguishment of the old contract, by the substitution of the new one.' . . . .

" 'For a novation to exist, there must be [evidence of] an agreement among the parties to extinguish the old obligation[s] and substitute a new one for it.' . . . .

"A novation is never presumed; the party asserting it must establish clearly and satisfactorily that there was an intention, concurred in by all the parties, that the existing obligation be discharged by the new obligation. . . . As was stated in [*District National Bank of Washington v. Mordecai,* 133 Md. 419, 427 (1919)], '[I]t does not result from the substitution of one paper

The situation antecedent to the May, 1974, agreement was this: the two notes were in default; they were secured by a third mortgage, behind two other mortgages totaling at least $935,000 and possibly $1,015,000 plus accrued interest, which were also in default; one of those mortgages — the first mortgage to Hebron — had not been anticipated by SJV; and the lease to Exten, which was the principal security for all of the SJV's undertakings and the sole source of its cash flow, was also in substantial default, nearly a full year's rent being past due. The primary thrust of the new agreement was directed at those problems. It looked to revitalize the Exten lease — the linchpin of the whole venture, cure the default on the mortgages, and provide for the servicing of the Hebron mortgage.

Insofar as the two notes (and the SLP mortgage) were concerned, only two direct changes were made: the maturity was reduced to 1985 — still eleven years in the future — and the annual payment date was moved from February to April. The parties agreed to the *possibility* of an increase or a decrease in the principal balance secured by the SLP mortgage if additional sums were advanced on behalf of SJV or if Exten Associates defaulted on certain of its obligations; but it does not appear that the principal amounts were, in fact, ever actually changed.

Neither Potomac nor Hazel or Garner extended any new credit to anyone in connection with that agreement. Their relationships with SJV, SLP, and each other remained the

---

writing for another, or one evidence of debt for another, or one contract for another, unless such substitution is made with the intention of all the parties concerned to extinguish the old one,'
. . . .

"The intention to substitute a new agreement for a previous contract need not be expressed however, since facts and circumstances surrounding the transaction, as well as the subsequent conduct by the parties, may show such an acceptance as clearly as an express agreement; but such facts and circumstances, when shown, must be such to establish that the intention to work a novation is clearly implied.

* * *

"Where the evidence is in conflict, the issue of whether or not there was a novation is one of fact for the jury, or the court sitting as a jury." (Citations omitted.)

same. By virtue of the acceleration clause in the notes, which was undisturbed, and the subsequent default in the payment of interest, even the changes in ultimate maturity and annual payment date became irrelevant. The obligation sought to be enforced is precisely that initially undertaken by SJV, and not any modifications made by the May, 1974 agreement. Neither the existence nor the nature or amount of the underlying obligation depends in any way upon that later agreement. Its only asserted effect is to transmute, through a fiction of presumptive or imputed consent, what was a full and joint individual liability into a limited and several one. *Compare Baltimore Academy of the Visitation v. Schapiro,* 169 Md. 332 (1935); *Cole, Administratrix v. Wilbanks,* 226 Md. 34 (1961); *Swift v. Allan,* 211 Md. 588 (1957); *Harford Bank v. Estate of Hopper,* 169 Md. 314 (1935); *Leisner v. Finnerty,* 252 Md. 558 (1969).

Looking at the 1974 agreement in that context, what evidence is there of a knowing intent on the part of Potomac, Hazel, or Garner to give up the only real security behind the notes — the joint liability of the partners — and to substitute for that the general credit of a virtually worthless entity and a five percent several liability of the partners? We find none, and will not infer it merely from the fact that they knew or had possession of the joint venture agreement. To do so would require us to make a double-level assumption for which no evidence exists in the record: (1) we would have to assume cognitive notice — actual awareness — of a limited several liability implicit from an eleven-word clause buried in a fifteen-page agreement under the caption "CAPITAL"; and (2) we would then have to infer from that assumptive cognitive notice an actual knowing consent to a most disadvantageous change in the contract that is in no way reflected or even hinted at in the new agreement. That, we think, stretches fiction beyond the point of reason.

For these reasons, we find that the court was correct in granting judgment in favor of appellants, but in error in limiting the judgments against the SJV partners. Those

partners (or such of them that have not been released) are jointly liable for the full amount of the obligation.

> *Judgment as to Sundowner Joint Venture affirmed; judgments as to joint venturers not otherwise released affirmed as to liability and reversed as to amounts; case remanded to Circuit Court for Worcester County for modification of judgments in accordance with this opinion; appellees to pay the costs.*