888 A.2d 377

Jerry J. MATHIS et al.

v.

Aaron HARGROVE.

No. 2604 Sept. Term, 2004.

Court of Special Appeals of Maryland.

Dec. 22, 2005.

288

Randy McRae (Stan D. Brown, Will Purcell, on brief), Landover, for appellant.

George Huckabay, Bethesda, for appellee.

Panel DAVIS, SALMON and ADKINS, JJ.

DAVIS, J.

Appellants, Jerry Mathis, Prudential Mathis Realtors and Mathis Realty, Inc.,[1] appeal from the verdict of a jury in the Circuit for Prince George's County, Clark, J., in favor of appellee, Aaron Hargrove. Appellants raise the following issues on this appeal:

I. Whether the circuit court wrongfully declined to decide on the motion for summary judgment;

II. Whether the circuit court erred by denying appellants' motion for summary judgment, where appellee failed to file an opposition to the motion;

III. Whether the circuit court, appellants' attorney, and appellee's attorney violated appellants' constitutional due process rights regarding a subpoenaed witness and by ignoring appellants' right to a ruling on motion;

I̤V. Whether the jury's verdict was supported by substantial evidence in a written record;

V. Whether appellee voluntarily breached his orally modified contact [sic];

A. Parties' Agreement Creates An Independent Contractor Relationship; and

B. Appellee Unilaterally Modified the Oral Contract, therein Breaching; and

VI. Whether the finding of fraud, evil intent, willful or knowing requires a showing of intent.

---

1. All references to appellant in the singular refer to Jerry Mathis.

## FACTS AND PROCEDURAL BACKGROUND

On August 1, 2001, appellant and Mathis Realtors, Inc., d/b/a, Prudential Mathis Realtors, entered into a Broker Associate Independent Contracting Agreement with appellee. Pursuant to § 9(B) of the Agreement, appellee promised to pay $2,000 per month to Prudential Mathis Realtors, Inc. Under the Agreement, appellee was to retain 100 percent of commissions he earned and, pursuant to the Addendum of even date, appellee was allowed to have, on his staff, up to four licensed agents working out of his designated office space without incurring any additional monthly rental fees. Each additional member of his "team," up to a maximum of seven, was required to pay a $150 per month rental fee and each associate under appellee's supervision was required to pay $150 per transaction up to four transactions per month.

In September 2002, appellant and appellee verbally agreed to modify the Broker Associate Agreement. Appellee would establish a new office in Bowie, pay fifty percent of the initial opening expenses, fifty percent of all subsequent operating expenses, and receive fifty percent of any future profits. Appellant insisted that they had agreed appellee was also to pay $2,000 per month as his initial investment capital as consideration for a partnership in the business. Appellant would continue to manage the Fort Washington office and appellee would manage the new office in Bowie.

According to appellee, there was a further agreement that the $25,000 rental commission paid by the owner of the office building for the five-year lease on the Bowie location executed by appellant would be divided equally between them. Appellee also claimed that he paid $27,329 of his own money between January and March of 2003, which constituted payment of the initial expenses to which they had agreed. In addition, he paid a rental commission of approximately $29,000. Appellants, in their submission to this Court, state: "On March 25, 2003, appellee, Hargrove, informed appellant, that he would have to disassociate himself from Jerry J. Mathis and Prudential Mathis Realtors, Inc."

In reference to the termination of the relationship, appellee testified that, after he, Jerry Mathis and his wife and other members of the Company returned from a convention in Las Vegas, Mathis and his wife summoned him into their office and told him that they were dissatisfied with his production. Appellee had a bad managerial style, he did not smile enough, and agents were afraid to talk to Jerry for fear that anything they said to him would be used by appellee against them. According to Hargrove, he was told by appellant and Ms. Mathis that "they no longer wanted me to manage the Ft. Washington—the midway office and our partnership arrangement was being abolished and I could no longer manage the Bowie office, the 50/50 percent arrangement, I could be anything but 50 percent." In short, Hargrove was told that Mathis had to have a controlling interest, that he could be anything in the Company except a manager, and that he could work out of any office other than the manager's office. When asked to describe his reaction to appellant's repudiation of their agreement, Hargrove explained:

Well, you know, I was devastated by it, because here's something that we both went into together. At this time I had almost in excess of you know 20, 30, $40,000 invested into their venture, and then I felt like the rug was being pulled out from underneath of me, and I thought that if he could change the rules of the game three months into the venture, what would happen if I got a year down the line or two years down the line with more invested into this venture. So at that point in time I just told him if your rules are going to change, then I can't continue to partner with you, and I took the option of taking no percentage and I offered him my resignation.

Appellee subsequently transferred his license, as did other members of his "team," to Realty Executives, 2000 in Bowie. On December 10, 2003, appellee filed a three-count complaint alleging in Count I, Replevin, Trespass and Conversion, stemming from appellant's "wrongfully barring Aaron Hargrove from retrieving his furniture and files" from the Fort Washington office of Prudential–Mathis Realtors, Inc.; Count II,

Breach of Contract, Breach of Fiduciary Duty, Fraud, based on appellant's alleged failure to make a full accounting and to remit commissions due within 20 business days after May 20, 2003 after securing drafts, made payable to Jerry J. Mathis and Prudential Mathis Realtors, Inc., received from appellee for transactions he procured; Count III, Breach of Partnership Agreement, Fraud, based on appellant's alleged termination of appellee and reduction in ownership interest from 50% to 49% after having been induced "to invest time and money into the opening of the Bowie office in return for a 50% ownership interest."

Prior to trial, the following transpired regarding appellants' motion for summary judgment:

THE COURT: All right. I'm ready to proceed. I see that there is a motion for summary judgment, but I don't understand why it wasn't ruled on.

[APPELLEE'S COUNSEL]: If I might just explain for the record, Your Honor?

THE COURT: Go ahead.

[APPELLANTS' COUNSEL]: May I invoke the rule on witnesses, or is that necessary?

THE COURT: No, that's all right. Anyone who is going to testify in this matter needs to remain outside the courtroom. While you're outside the courtroom, you're not to discuss this matter amongst yourselves or with anyone else.

[APPELLEE'S COUNSEL]: Thank you, Your Honor. Your Honor, as opposing counsel has indicated, the motion for summary judgment was actually filed after the date of the scheduling order. We had our pretrial conference on June the 23rd. At that time, which I originally entered my appearance as counsel in the case, outgoing counsel had not conducted discovery.

The defendant was prejudiced in that matter, so we asked the judge at the time to allow reopening of discovery. He did so. Discovery was reopened for a sixty-day period. Co-counsel—opposing—counsel and myself agreed to ex-

tend it beyond that. In fact, we did not complete discovery in this matter until September, I think it was, 17th of this year time frame.

By the time approximately twenty depositions and hundreds of pages of deposition testimony and exhibits were actually produced for us and then got a chance to decipher it and apply the theory to the case, it was the November time frame.

We then, looking at the evidence, the affidavit, you know, the admissions, submitted a motion for summary judgment.

As counsel indicated, by the date that was filed their response was not due until, again, tomorrow. He filed a motion to strike on behalf of the plaintiff. We did not get that because of a mail mix up. The motion linked to the wrong address, came back, and counsel diligently had it Fed Ex'd to me. The second I received it I immediately turned around and filed an opposition and also asked the court at that time I filed a motion last Friday to continue the trial.

Pending the court's decision with respect to the motion for summary judgment, of course, counsel indicates, you know, that he wants to proceed. We are prepared to proceed. However, as the court will recognize, we've got two attorneys over here. I've handled it as *pro hac vice.* The defendant, as counter-plaintiff. Is [sic] required to have two counsels [sic] here. My position was that it prejudices the defendants.

THE COURT: Has there been an order permitting you to practice?

[APPELLEE'S COUNSEL]: Yes, ma'am. There's one in there. Judge Missouri signed it and—but the problem, obviously, that we have, that if the matter can be resolved via summary judgment, therefore it reduces the amount of the money that the client has to pay. So I thought it was a prudent way to go, given the evidence that we discovered in the case via discovery. Had discovery been

originally conducted according to the original schedule, of course, those motions would be filed on time and we wouldn't be in this predicament.

THE COURT: I think we have to proceed with the trial. We already selected the jury.

[APPELLANTS' COUNSEL]: Your Honor, may I be heard just so-I need to know what my comfort level is as to whether I have to go back to my office and spend overnight opposing that motion for summary judgment.

THE COURT: No, you don't.

[APPELLANTS' COUNSEL]: So is my motion to strike granted?

THE COURT: No, the motion, basically, once the trial is over, the motion will be moot.

At the conclusion of the trial, the case was submitted to the jury, which rendered the following verdicts: as to Count I, replevin, the jury awarded appellee $5,700; as to Count II, breach of contract for failing to pay commissions earned from listings in sales transactions settled after appellee's termination, the jury awarded appellee $49,362.74; and as to Count III, breach of contract for failure to abide by the terms of the opening of the office in Bowie, the jury awarded appellee $39,622.81. Because the jury determined in the first phase of the trial that appellants' actions were characterized by evil motive, intent to injure, ill will and fraud, as part of the second phase of the trial they awarded appellee punitive damages on Count I in the amount of zero dollars; on Count II in the amount of $5,000; on Count III in the amount of $29,059.40. From the jury's verdicts and the judgments entered thereon, this timely appeal was filed.

## LEGAL ANALYSIS

Appellants contend in the first issue presented, "in the instant matter, reservation of the ruling on appellants' motion for summary judgment, effectively or impliedly denied the motion, thereby opining that there were outstanding material issues of genuine fact."

## MOTION FOR SUMMARY JUDGMENT

Maryland Rule 2–501, Motion for Summary Judgment, provides, in pertinent part:

**(a) Motion.** Any party may make a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law. The motion shall be supported by affidavit if it is (1) filed before the day on which the adverse party's initial pleading or motion is filed or (2) based on facts not contained in the record.

**(b) Response.** A response to a written motion for summary judgment shall be in writing and shall (1) identify with particularity each material fact as to which it is contended that there is a genuine dispute and (2) as to each such fact, identify and attach the relevant portion of the specific document, discovery response, transcript of testimony (by page and line), or other statement under oath that demonstrates the dispute. A response asserting the existence of a material fact or controverting any fact contained in the record shall be supported by an affidavit or other written statement under oath.

**(c) Form of Affidavit.** An affidavit supporting or opposing a motion for summary judgment shall be made upon personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit.

**(d) Affidavit of Defense Not Available.** If the court is satisfied from the affidavit of a party opposing a motion for summary judgment that the facts essential to justify the opposition cannot be set forth for reasons stated in the affidavit, the court may deny the motion or may order a continuance to permit affidavits to be obtained or discovery to be conducted or may enter any other order that justice requires.

**(e) Contradictory Affidavit or Statement.**

(1) A party may file a motion to strike an affidavit or other statement under oath to the extent that it contradicts any prior sworn statement of the person making the affidavit or statement. Prior sworn statements include (A) testimony at a prior hearing, (B) an answer to an interrogatory, and (C) deposition testimony that has not been corrected by changes made within the time allowed by Rule 2–415.

(2) If the court finds that the affidavit or other statement under oath materially contradicts the prior sworn statement, the court shall strike the contradictory part unless the court determines that (A) the person reasonably believed the prior statement to be true based on facts known to the person at the time the prior statement was made, and (B) the statement in the affidavit or other statement under oath is based on facts that were not known to the person and could not reasonably have been known to the person at the time the prior statement was made or, if the prior statement was made in a deposition, within the time allowed by Rule 2–415(d) for correcting the deposition.

**(f) Entry of Judgment.** The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law. By order pursuant to Rule 2–602(b), the court may direct entry of judgment (1) for or against one or more but less than all of the parties to the action, (2) upon one or more but less than all of the claims presented by a party to the action, or (3) for some but less than all of the amount requested when the claim for relief is for money only and the court reserves disposition of the balance of the amount requested. If the judgment is entered against a party in default for failure to appear in the action, the clerk promptly shall send a copy of the judgment to that party at the party's last known address appearing in the court file.

We engaged in an in-depth discussion of the obligations imposed on the parties, on a motion for summary judgment, to establish the necessity, *vel non*, for a controversy to proceed

to a trial on the merits in *Bond v. Nibco, Inc.*, 96 Md.App. 127, 134–36, 623 A.2d 731 (1993). Because of the centrality of the operative effect of a motion for summary judgment, we quote liberally from that discussion in *Bond.*

Thus, a moving party must set forth sufficient grounds for summary judgment. Although the movant is not required to support his motion with an affidavit unless he files it "before the day on which the adverse party's initial pleading or motion is filed," *see* Md. Rule 2–501(a), he must support his various contentions by placing before the court facts that would be admissible in evidence or otherwise detailing the absence of evidence in the record to support a cause of action.

The Supreme Court and the Court of Appeals have, in recent years, emphasized that a trial court should not be reluctant to grant a motion for summary judgment in an appropriate case. In *Seaboard Surety Co. v. Richard F. Kline, Inc.*, 91 Md.App. 236, 242–45, 603 A.2d 1357 (1992), we discussed at some length these teachings, emphasizing that a motion for summary judgment, although not a substitute for trial, is nevertheless *not* disfavored. A proper summary judgment motion is to be granted unless the parties truly dispute a material fact, *i.e.*, the evidence is such that a fair minded jury could return a verdict for the nonmovant. *Id.* at 244, 603 A.2d 1357. For this reason, although a party opposing a proper motion for summary judgment need not file an affidavit unless "the motion . . . is supported by an affidavit or other statement under oath," *see* Md. Rule 2–501(b), the opponent cannot rely on formal denials or general allegations. Instead, an opponent must "identify with particularity the material facts that are disputed." Md. Rule 2–501(b). Thus, *"[when a moving party has set forth sufficient grounds for summary judgment,]* the party opposing the motion must show with 'some precision' that there is a genuine dispute as to a material fact," and place before the trial court facts that would be admissible in evidence.

All of these principles remain good law; we do not disavow or limit any of them. They are, however, all premised on a *proper* motion for summary judgment. A party moving for summary judgment, like a party filing any other motion, must comply with Md. Rule 2–311. *See* Paul V. Niemeyer & Linda M. Schuett, Maryland Rules Commentary 171 (2d ed. 1992) ("Niemeyer"). *See also* Md. Rules Committee, Minutes of Oct. 17, 1981 meeting, at 48 ("Rule 2–311 . . . governs all motions, including summary judgment motions"). That is, if the summary judgment motion is based on facts not contained in the record or papers on file in the proceeding it "shall be supported by affidavit and accompanied by any papers on which it is based." Md. Rule 2–311(d) (1993).

Moreover, as the Supreme Court noted in articulating its now famous *Celotex Corp. [v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)] holding, even when an affidavit is not necessary

. . . a party seeking summary judgment *always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings,* depositions, answers to interrogatories and admissions on file, together with the affidavits, if any," *which it believes demonstrate the absence of a genuine issue of material fact.*

*Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2553. (emphasis added). "To satisfy the requirement that there be no genuine dispute as to any material fact, the moving party *must include in the motion the facts necessary to obtain judgment and a showing that there is no dispute as to any of those facts."* Niemeyer at 330 (emphasis added). *Only* if a movant "bears this initial responsibility" or makes this "showing" does the party opposing the summary judgment motion have the burden of identifying "with particularity the material facts that are disputed." Md. Rule 2–501(b). *See Galindo v. Precision American Corp.,* 754 F.2d 1212, 1216, 1221 (5th Cir.1985). Thus, a motion for summary judgment that simply asserts that the opponent has not

identified disputed facts is not sufficient. A summary judgment movant usually is not required to file an affidavit, *see* Md. Rule 2–501(a), but *if* the movant disputes facts alleged in the complaint (or answer if the movant is the plaintiff), the movant must himself identify the portions of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. Indeed, the movant must attach "as an exhibit" to his motion "any document" that he "wishes the court to consider in ruling on the motion . . . unless the document is adopted by reference as permitted by Rule 2–303(d) or set forth as permitted by Rule 2–432(b)." Md. Rule 2–311(c) (1993).

(Citations omitted.)

## I

We begin by accepting appellants' premise that the circuit court's reservation of its ruling on the motion for summary judgment effectively operated to deny the motion. As the court put it, ". . . once the trial is over, the motion will be moot." The extenuating circumstances regarding the failure of appellee's prior trial counsel to comply with the discovery schedule and which, in turn, reduced the time for appellee to respond to the motion for summary judgment, are set forth, *supra.* That said, although a motion for summary judgment may be filed at any time prior to or during the trial, *see Baker, Watts & Co. v. Miles & Stockbridge,* 95 Md.App. 145, 161, 620 A.2d 356 (1993)[2], the reservation of the court's ruling on the motion defeats the very purpose for filing the motion pretrial, i.e., to obviate the need for a trial where there is no dispute as to a fact which is material to the outcome of the case. Moreover, it is well settled that the denial of a motion for summary judgment is, in most instances, an interlocutory

---

2. In 2005, the Rule was amended changing the language that read "Any party may file at any time a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law." *See supra* p. 8.

order[3] not subject to an immediate appeal, but reviewable only after the conclusion of proceedings ending in a final judgment.

Appellants, in essence, claim that there were no outstanding issues of material fact and apparently that a legal ruling should have been forthcoming, in favor of either appellant or appellee. With the foregoing in mind, our task, as we see it, is to determine the nature and extent of appellate review of the court's refusal to rule on the motion to which appellant is entitled, and what legal harm appellant has sustained from the inability to obtain a determination, pre-trial, as to whether appellant was entitled to judgment as a matter of law based on the pleadings, depositions, interrogatories, affidavits, discovery and other submissions offered on the motion.

In *Metropolitan Mortgage Fund, Inc. v. Basiliko*, 288 Md. 25, 26, 415 A.2d 582 (1980), the Court of Appeals discussed the narrow question of the standard of review for a pretrial denial of summary judgment following a full trial on the merits. In that case, the Court stated:

> Consequently, we now hold that a denial (as distinguished from a grant) of a summary judgment motion, as well as foregoing the ruling on such a motion either temporarily until later in the proceedings or for resolution by trial of the general issue, involves not only pure legal questions but also an exercise of discretion as to whether the decision should be postponed until it can be supported by a complete factual record; and we further hold that on appeal, absent clear abuse ..., the manner in which this discretion is exercised will not be disturbed.

*Id.* at 29, 415 A.2d 582.

Relying upon federal authority, the Court explained that, while a court is generally not able to "draw upon any discre-

---

3. *See* Md.Code (2002 Repl.Vol., 2004 Supp.), Cts. & Jud. Proc. (C.J.), § 12–303, which provides a listing of appealable interlocutory orders; *see also Public Service Commission of Maryland v. Patuxent Valley Conservation League*, 300 Md. 200, 206, 477 A.2d 759 (1984), describing the "collateral order doctrine," which treats as final a limited class of orders that do not terminate the litigation.

**304**

tionary power to grant summary judgment, it ordinarily does possess discretion to refuse to pass upon, as well as discretion affirmatively to deny, a summary judgment request in favor of a full hearing on the merits; and this discretion exists even though the technical requirements for entry of such a judgment have been met." *Id.* at 28, 415 A.2d 582. *Basiliko* goes on to state: "It is our view that an appellate court should be loath indeed to overturn, on a very narrow procedural ground, a final judgment on the merits entered in favor of the party resisting the summary judgment." *Id.* at 29, 415 A.2d 582. *See also Foy v. Prudential Insurance Company of America,* 316 Md. 418, 423–24, 559 A.2d 371 (1989). "It follows from our holdings in *Fenwick [Motor Co. v. Fenwick,* 258 Md. 134, 265 A.2d 256 (1970)] and *Basiliko, [supra],* that ordinarily no party is entitled to summary judgment as a matter of law. It is within the discretion of the judge hearing the motion, if he finds no uncontroverted material facts, to grant summary judgment or to require a trial on the merits. It is not reversible error for him to deny the motion and require a trial." *Prudential Ins. Co. of Am.,* 316 Md. at 424, 559 A.2d 371.

Remaining true to the basic premise recited, *supra,* we have found occasion to reverse the denial of summary judgment. *See Presbyterian University Hospital v. Wilson,* 99 Md.App. 305, 637 A.2d 486 (1994), *aff'd, Presbyterian University Hospital v. Wilson,* 337 Md. 541, 654 A.2d 1324 (1995). In *Wilson,* we determined that, in a case where the issue is purely one of law, that could not properly be submitted to the trier of fact for resolution, it is appropriate for us to review the trial court's denial of summary judgment. 99 Md.App. at 313–14, 637 A.2d 486. In that case, the issue of lack of personal jurisdiction was submitted as part of a summary judgment motion, which the trial court denied. *Id.* at 310, 637 A.2d 486. The appellees in *Wilson* argued that *Basiliko* limited our review to abuse of discretion on the part of the trial court. *Id.* at 311, 637 A.2d 486. We determined, however, and the Court of Appeals agreed, *see Wilson,* 337 Md. at 548–59, 654 A.2d 1324, that the motion for summary judgment was in effect an

extension of Presbyterian's motion to dismiss for lack of personal jurisdiction, which was reviewable on appeal. *Id.* at 314–15, 637 A.2d 486.

We noted in *Manown v. Adams,* 89 Md.App. 503, 598 A.2d 821 (1991), however, that it is a rare circumstance for an appellate court to reverse a trial court's denial of a summary judgment motion after there has been a full trial on the merits. *Id.* at 514, 598 A.2d 821, *vacated* 328 Md. 463, 615 A.2d 611 (1992). In vacating our decision in *Adams,* the Court explained:

> Given that a circuit court has the discretion to deny a motion for summary judgment, even though the record on summary judgment would support grant[ing] of the motion at that time, the correct mode of analysis here is to determine whether the party moving for judgment at the conclusion of trial is entitled to judgment as a matter of law on the record as it stands at that time.

*Manown,* 328 Md. at 472 n. 4, 615 A.2d 611.

The rationale which undergirds our resistance to reverse a trial court's denial of a summary judgment motion was explained by Judge Digges in *Basiliko.* If after a full evidentiary hearing, in which the party opposing a summary judgment prevails on the merits, were we to reverse, in essence that "would be nothing short of substituting a known unjust result for a known just one." *Basiliko,* 288 Md. at 29, 415 A.2d 582.[4]

---

4. *See Wilson,* 99 Md.App. at 313 n. 2, 637 A.2d 486 ("In some jurisdictions denial of a motion for summary judgment is not reviewable at all. The wisdom for that rule was explained thusly: To deny review seems to be unjust. But to grant it ... would be unjust to the party that was victorious at trial, which won judgment after the evidence was more completely presented, where cross-examination played its part and where witnesses were seen and appraised.... The greater injustice would be to the party which would be deprived of the jury verdict. Otherwise, a decision based on less evidence would prevail over a verdict reached on more evidence and judgment would be taken away from the victor and given to the loser despite the victor having the greater weight of evidence. This would defeat the fundamental purpose of judicial inquiry.") (citations omitted).

■ Appellants tell us that ruling on the motion for summary judgment is compulsory upon the trial court. They insist that there is no rule nor provision of law that allows the court the discretion to "reserve" ruling on a motion for summary judgment. *Basiliko, Manown, Wilson* and decisions cited therein, *supra,* hold otherwise. The trial court is not only vested with the discretion to reserve ruling or forego ruling on the motion entirely, but that discretion exists even where a party meets all the technical requirements for summary judgment. This principle holds true even where, as appellant claims here, there are no disputes as to a material fact. *See Porter Hayden Company v. Commercial Union Insurance Co.,* 339 Md. 150, 164, 661 A.2d 691 (1995).

■ Accepting our initial premise that the trial court's refusal to rule on the motion was effectively a denial, such a refusal is only reviewable upon an abuse of discretion standard. We perceive no such abuse of discretion in this case. The denial of the motion for summary judgment did not preclude appellants from defending their case on the merits, nor were they prevented from placing the evidence offered in support of their motion for summary judgment before the jury. More importantly, appellants' motion for summary judgment presented factual issues, rather than pure questions of law, properly submitted to a trier of fact—in this instance, a jury—for determination.

■ To further support their claim that the trial court's refusal to rule on their summary judgment motion constituted error, appellants allude to appellee's failure to respond to their motion. The failure to contradict facts recited in appellants' affidavits constitutes an admission of those facts for purposes of summary judgment. *See Roe v. Citizens National Bank,* 32 Md.App. 1, 11, 358 A.2d 267 (1976). Because there was no response to the motion by appellee, appellants conclude that summary judgment was necessary. The record reflects that, at the time the trial court declined to rule on the motion in favor of proceeding to trial on the merits, the following day was the deadline for appellee to submit his opposition to the

motion. Because of the confusion stemming from the scheduling order, the trial court had instructed appellee that he was not required to respond to the motion. We need not reach the question whether the court's action in excusing appellee's obligation to respond was appropriate. It certainly was reasonable for appellee's counsel to rely on the court's decision.

■ Finally, appellants assert that the trial court's failure to rule on their motion violated their Fourteenth Amendment substantive due process rights, in that, the trial court's actions render the law on summary judgment impermissibly meaningless and vague. They seek solace in the opinions rendered by the Court of Appeals in *Ferro v. Lewis,* 348 Md. 593, 705 A.2d 311 (1998) and *Bowers v. State,* 283 Md. 115, 389 A.2d 341 (1978).

■■ The appellant in *Lewis* challenged the law requiring operators of motorcycles to wear head gear approved by the Motor Vehicle Administration on vagueness grounds. *Lewis,* 348 Md. at 605, 705 A.2d 311. A challenge on the grounds of vagueness requires ascertainment of whether the statute forbids or requires the doing of an act in terms so vague that men or women of common intelligence must necessarily guess at its meaning and differ as to its application. *Id.* at 607, 705 A.2d 311. The determination rests upon the consideration of two criteria. *Bowers,* 283 Md. at 120–21, 389 A.2d 341.

The first requirement is that the statute provide fair notice, and secondly, it must provide legally fixed standards and adequate guidelines for those charged with enforcement, application and administration of the law. *Id.* at 121, 389 A.2d 341. As we have noted, *supra,* one seeking adjudication of his or her claim pursuant to Md. Rule 2–501 may only assign error when the motions court reserves ruling or fails to rule on the motion when the issues presented are pure questions of law. To be sure, the proceedings prior to the filing of the motion for summary judgment and the disposition thereof, in this case, were unique. It is unavailing for one seeking to invoke Md. Rule 2–501 to suggest that this standard is vague or fails to provide guidelines as to the circumstances under which a

party is entitled to a definitive decision before trial. We thus perceive no abuse of discretion on the part of the trial court in declining to rule on the motion in favor of trial on the merits.

Maryland case law clearly endorses the practice of reserving ruling on the motion pending submission of the case to the fact-finder. Notwithstanding the underlying purpose of summary judgment, *i.e.*, to obviate the need for a trial where only legal issues are presented, it is not a substitute for a trial on the merits. A trial on the merits was held in this case, where on a more complete record, a jury determined the outcome in favor of appellee. Requiring appellant to defend this cause of action on the merits did not constitute error. Moreover, the Court of Appeals, in *Adams,* informs us that an appellant, who moves for judgment as a matter of law at the conclusion of trial, is entitled to judgment on the record as it stands at that time. Hence, assuming *arguendo* that appellants had been entitled to judgment as a matter of law on the state of the undisputed facts of record prior to trial, once there was a complete record at the conclusion of the evidence, their legal entitlement to judgment would only be based on that record. Our review of the record discloses that the instant case does not present purely legal issues for our review. Therefore, the case does not present one of the rare instances when a court's decision to reserve its ruling on a motion for summary judgment constitutes an abuse of discretion. We therefore perceive no such abuse of discretion.

## II

Prior to trial, the parties conferred and agreed to stipulate to the authenticity of a letter dated May 20, 2003, authored by appellant's then counsel, Michael Taylor, Esquire, that was sent to and received by appellee's counsel. The facts surrounding the agreement to stipulate, according to the record, are that Taylor suffered a massive stroke and was unable to appear, although he had been subpoenaed by appellee. The record further indicates that appellants were given an opportunity to examine the documents with counsel prior to enter-

ing into the stipulation agreement. The colloquy was as follows:

> THE COURT: I tell you what, whatever you think you need a stipulation to, you take the next 15, 20 minutes and work on it, and if we still are at [sic] a problem, we've got to figure out how we're going to proceed.
>
> *　*　*
>
> [Appellants' Counsel]: I think we solved the issues. I think we have come to an understanding.
>
> [Appellee's Counsel]: We have agreed, Your Honor, to stipulate to the authenticity of the May 20, 2003, letter from Mr. Taylor to myself.... Well, first let me let [Appellant's Counsel] say that is or is not our stipulation.
>
> [Appellants' Counsel]: That was our understanding, Your Honor. In detail [sic] looked at each of the documents. My clients have seen the respective documents, and I think that will help the process.

On appeal, appellant denies that he discussed the stipulation with his counsel, denies that he authorized the stipulation and claims that throughout he wanted to cross-examine Taylor. Appellants now argue that their "due process rights were violated and, as a result, they were denied a fair hearing on the motion for summary judgment, denied the right to have an important subpoenaed witness present and denied a fair process overall."

■ "A stipulation is an agreement between counsel akin to a contract" and, like a contract, stipulations are "based on the mutual assent and interpreted to effectuate the intent of the parties." *Ragin v. Porter Hayden Co.*, 133 Md.App. 116, 135, 754 A.2d 503 (2000) *(citing State v. Broberg*, 342 Md. 544, 558, 677 A.2d 602 (1996)) and cases cited therein. In *Bloom v. Graff*, 191 Md. 733, 736, 63 A.2d 313 (1949), the Court of Appeals explained:

> Often at the trial of cases certain stipulations are made by counsel in order to save the time of the court, the expense and difficulty of producing witnesses, and for other good

reasons. Where such a stipulation is agreed to by counsel the orderly trial of the case demands that the parties be bound thereby.

The parties stipulated to the authenticity of the May 20, 2003 letter, in large part, because Taylor, alleged to have written the letter, was unable, for medical reasons, to appear at the trial. Appellant was given an opportunity to examine the letter and, upon returning to the courtroom with counsel, agreed to the stipulation. Appellant, on appeal, baldly asserts that those events did not occur. Our examination of the record in this case reveals that, not only did appellant stipulate to the authenticity of the May 20, 2003 letter, but to forty-one other documents, including other letters, checks and receipts. Moreover, while the parties stipulated to the authenticity of the documents, that is very different from stipulating to their admissibility. If appellant wished to challenge the documents, he was presented with sufficient opportunity to do so. Appellants' claims on this issue are spurious. Counsel participated in approving the stipulations and acquiesced in their authenticity, without objection. We reject appellants' claim that their due process rights were violated.

## III

 Appellants next contend that there was "substantial evidence in the record for the jury to have legally denied the contract breach argument." As best we can determine, appellants appear to be challenging the sufficiency of the evidence to support the jury's verdict in favor of appellee. They rely upon the "substantial evidence standard" as applied in *AT & T Wireless PCS, Inc. v. City Council of the City of Virginia Beach*, 155 F.3d 423 (1998). This standard is inapplicable to the case at bar.[5]

---

5. The "substantial evidence standard," applies to an appellate court's review of an agency or legislative bodies' decision. *See Id.* at 430. *See also Beeman v. Dept. of Health and Mental Hygiene*, 107 Md.App. 122, 135–37, 666 A.2d 1314 (1995). The proper standard in a civil action, as is the case at hand, is the "preponderance of the evidence" standard.

More importantly, the record reflects, and appellants' counsel acknowledged during oral argument before a panel of this Court, that, although he made a motion for judgment at the conclusion of his case, he did not do so at the conclusion of the entire case. The law is well settled that we will not review a challenge to the sufficiency of the evidence where there is a failure to move for judgment at the conclusion of all the evidence. *Webb v. Oxley*, 226 Md. 339, 347, 173 A.2d 358 (1961); *Bugg v. Trustees of Cokesbury Baptist Church*, 252 Md. 59, 60, 248 A.2d 879 (1969); *see also Larche v. Car Wholesalers, Inc.*, 80 Md.App. 322, 329, 562 A.2d 1305 (1989); *Gittin v. Haught–Bingham*, 123 Md.App. 44, 48, 716 A.2d 1063 (1998) (citing *Fearnow v. Chesapeake & Potomac Telephone Co.*, 104 Md.App. 1, 655 A.2d 1 (1995)). As we said in *Fearnow*, "These procedural safeguards are necessary to ensure that the opposing party is not 'sandbagged.'" 104 Md.App. at 27, 655 A.2d 1. Consequently, appellants' claim of insufficiency of the evidence has not been preserved. Had appellant properly preserved the issue for appellate review, we would nonetheless conclude that there was sufficient evidence to sustain appellee's claims.

In this case, appellee also claimed that appellant committed fraud. Under Maryland law, fraud must be proven by the heightened standard of "clear and convincing" evidence. *Hoffman v. Stamper*, 385 Md. 1, 16, 867 A.2d 276 (2005). The

*See Wills v. State*, 329 Md. 370, 373–74, 620 A.2d 295 (1993). "On burden of proving by a preponderance of the evidence, we have said, 'In any case, civil or criminal, to meet the test of legal sufficiency, evidence (if believed) must either show directly or support a rational inference of, the fact to be proved. In a civil case, the fact must be shown, or the inference supported, by a preponderance of probability or an opposite preponderance must be overcome.'" *Id.* at n. 1, 620 A.2d 295 (citing *Edwards v. State*, 198 Md. 132, 157–58, 81 A.2d 631 (1951)). "To prove by a preponderance of the evidence means to prove that something is more likely so than not so. In other words, a preponderance of the evidence means such evidence which, when considered and compared with the evidence opposed to it, has more convincing force and produces in your minds a belief that it is more likely true than not true." *Coleman v. Anne Arundel County Police Dept.*, 369 Md. 108, 127 n. 16, 797 A.2d 770 (2002).

clear and convincing standard was also defined in *Wills* as "more than a preponderance of the evidence and less than evidence beyond a reasonable doubt. . . ." 329 Md. at 374 n. 1, 620 A.2d 295 (citing *Whittington v. State*, 8 Md.App. 676, 679, n. 3, 262 A.2d 75 (1970)). To be clear and convincing, evidence should be "clear" in the sense that it is certain, plain to the understanding, and unambiguous and "convincing" in the sense that it is so reasonable and persuasive as to cause one to believe it. *Id.* (citing *Maryland Civil Pattern Jury Instructions*, § 1:8b. (1984)(MPJI)).

The only basis appellants articulate in support of this argument is that the testimony of three of their witnesses contradicted the testimony of appellee. The weight of the evidence is an incidence of quality, *i.e.,* credibility and persuasiveness, not quantity. Moreover, submitted to the jury was a significant number of documents appellants assail because of their alleged inconsistency with other evidence of record. Appellee's testimony and the documentary evidence were legally sufficient to sustain the jury's verdict. Additionally, the court properly instructed the jury on the burden of proof required to establish the cause of action pled, and the jury returned a unanimous verdict for appellee based upon the proper standard.

## IV

We next address appellants' assignment of error, which they denote as question number VI. The jury in the case awarded appellee compensatory damages for appellants' failure to return appellee's furniture and files in the amount of $5,700; for withholding appellee's real estate commissions in the amount of $49,362.74; and for breaching the partnership agreement in the amount of $39,662.81. Additionally, the jury found by clear and convincing evidence, as indicated, that appellants' actions were characterized by evil motive, intent to injure, ill will and/or fraud. In a second phase of the trial, the jury awarded appellee punitive damages in the amount of $5,000. In making this award, the jury concluded, as appellee

had alleged,[6] that appellee had received checks made out to the Company representing commissions earned by Hargrove from specific transactions and had turned over the checks to Mathis, in reliance on promises made in a letter dated May 20, 2003—which, at the time, Mathis and his attorney had no intention to keep—that Hargrove's share of the commission checks would be paid to Hargrove once he turned over the checks to Mathis. Finally, the jury awarded $29,059.49 for fraud in the inducement as to the principal agreement.

The gravamen of appellants' claim of error is that the award of punitive damages is only appropriate in a case of fraud where there has been a showing that the person making the false statement has actual knowledge of the statement's falsity. Appellee is alleged to only have generally established the elements of fraud, but failed to prove by "clear" evidence that appellant made statements he actually knew were not true. Appellants also allege that the jury was not properly instructed as to the proper basis for an award of punitive damages.

This issue was addressed in depth by the Court of Appeals in *Ellerin v. Fairfax Savings, F.S.B.,* 337 Md. 216, 652 A.2d 1117 (1995). The Court held that "a person's actual knowledge that his statement is false, coupled with his intent to deceive another by means of that statement, constitute the 'actual malice' required for the availability of punitive damages." *Id.* at 240, 652 A.2d 1117. Making a statement with the knowledge that the representation made is false is the type of deliberate wrongdoing that supports the award of punitive damages, contrasted by the fact that reckless disregard for the truth or falsity of a statement falls short of the

---

6. Appellee alleged, in paragraph 25 of his complaint: "When Jerry J. Mathis and Prudential Mathis Realtors, Inc. (through counsel) promised to provide Aaron Hargrove with a full accounting and payment of all commissions due 'within 20 business days' after May 20, 2003, Jerry J. Mathis and Prudential Mathis Realtors, Inc. did so in order to defraud Aaron Hargrove by inducing him to continue sending his commission checks to Jerry J. Mathis and Prudential Mathis Realtors, Inc. when Jerry J. Mathis and Prudential Mathis Realtors, Inc. had no intention of providing an accounting or paying the commissions owed to Aaron Hargrove."

intent required to support a punitive damage claim. *Id.* at 235, 652 A.2d 1117.

The elements of the tort of fraud which appellee was required to establish were set out in the landmark case of *McAleer v. Horsey*, 35 Md. 439, 452–54 (1872). *See Ellerin,* 337 Md. at 238–39, 652 A.2d 1117. A person claiming fraud must establish:

1) that the defendant made a false representation to the plaintiff, 2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, 3) that the misrepresentation was made for the purpose of defrauding the plaintiff, 4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and 5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Ellerin,* 337 Md. at 229–30, 652 A.2d 1117 and cases cited therein. The trial court's instructions during the liability phase of the trial, as we stated, were correct regarding the elements of fraud.

Preliminarily, appellants failed to object to the court's instructions at either phase of the trial. We review the jury instructions to determine if the instructions given were correct. The court instructed the jury during the punitive damages phase as follows:

An award of punitive damages in this case requires that the [appellant] acted with a certain state of mind. If you find the [appellant] actually knew the representation was false and expected the [appellee] to rely upon the representation, you may make an award for punitive damages. While an award for compensatory damages may be based upon a finding that the [appellant] made the representation with reckless indifference to its truth, this is not sufficient to warrant the award of punitive damages. Negligence, however gross, is not enough to award punitive damages. The [appellants'] knowledge of the falsity of the representation is the state of mind that justifies the award of punitive damages.

The trial court's instructions were: (a) a correct statement of the law and (b) applicable to the facts of the case. Put another way, the instruction given by the court concerning the award of punitive damages in the case was proper. In addition to providing the general instruction to the jury on the necessary elements of a fraud claim, the court instructed the jury properly on the requirement that a person make false statements with actual knowledge of their falsity in order to sustain an award for punitive damages.

Appellant asserts that there was no evidence offered to indicate that he had knowledge that any statements he made were false. In this regard, he states that there were no admissions on his part that he had knowledge, no corroboration by another witness, nor any documentary evidence to support the conclusion that he knew his statements to be false.

There is no requirement that appellant admit to knowing a statement is false before a jury may reach that conclusion, so long as there is clear and convincing evidence presented that appellant knew his representations were false; a jury is entitled to make that finding. There was documentary evidence submitted in the form of letters between Taylor, representing the appellant, and counsel for appellee, which indicated that appellee was to continue to submit commission checks for sales completed after he left the employ of appellant, in exchange for a full accounting on the commissions followed by a payout to appellee of the amounts due. The checks were deposited by appellants and no accounting ever took place, as promised. Appellee also testified that appellant agreed to a 50/50 split of the commissions earned in the Bowie office and that he would be the office manager. It was this agreement which induced appellee to open the Bowie office and make a financial investment in it. Thereafter, appellant informed appellee that he would only receive a forty-nine percent share of the revenues generated by that office and would no longer be the manager. The evidence adduced at trial confirmed that those were the terms of the agreement.

■ "The clear and convincing standard does not require irrefutable evidence, nor does it require evidence beyond a reasonable doubt," *see Anne Arundel County Police Dept.,* 369 Md. at 127 n. 16, 797 A.2d 770 (The highest standard of proof, firmly entrenched in, and reserved for, our criminal justice system, requires proof beyond a reasonable doubt ...), so long as the evidence is unambiguous and plain to the understanding and it is reasonable and persuasive enough to convince the jury. We think the standard has been met in this case. *See Wills,* 329 Md. at 374 n. 1, 620 A.2d 295. Without attempting to speculate as to the possible reason the jury may have been convinced, suffice it to say that the statements in the letter from appellants' former attorney are attributable to appellants. Additionally, appellants deposited the commission checks sent by appellee. Appellee testified that appellant was involved in the negotiations concerning the opening of the new office and it was appellant who then informed him of the change in percentage and management. From the foregoing, the jury could reasonably infer that appellants' decision not to abide by the terms of their agreement was made at the time they negotiated the agreement. The evidence, under such circumstances, was not outside the bounds of the clear and convincing standard, such that the jury could not have found appellant had knowledge that his representations, at the time they were made, were not true. Consequently, we hold that the evidence was clear and convincing that appellant had knowledge of the falsity of his statements. We shall not, therefore, disturb the punitive damage award.

## V

Appellants present a two part argument in which they contend, first, that appellee's agreement creates an independent contractor relationship.[7]

---

7. We quote the verbatim text of this argument as set forth in their brief:

 Although the Circuit Court was wrong to decide that a factual issue of the contract existence between Appellant and Appellee, it is none-

We are unable to decipher the thrust of appellants' first argument, other than the vague assertion that the benefit appellee realized from profits received from his subagents cannot serve to provide a basis for appellee to avoid liability under the "original written contract." Appellants, generally, assert that appellee was an independent contractor and, as such, was free to recruit subagents. The fact that appellee's subagents are independent contractors and that the agreement between appellee and his subagents is financially, mutually beneficial to them is of no moment in a determination of whether appellants have breached the original agreement. The original agreement between appellants and appellee contemplated the arrangement appellee would have with his subagents, with certain fees to be paid by appellee to appellants, based on the number of transactions per month conducted by the subagents. The right of appellee to recruit subagents, whether the subagents made sales and the number of

theless clear even from the information presented to the Court that Appellee is an independent contractor.

The Agent's Agreement which Appellant attached to its motion for summary judgment was written to benefit Appellee and demonstrates equal control exercised by Appellee and Appellant. Therefore, it is beyond reasonable argument that the subject was also favorable to Appellee.

The Agreement makes it clear that the contract is for Appellee's benefit. It implies that:

The overall objectives of this Agreement are:

1. To provide a relationship which will result in the best possible service to the customer.

2. To assist the Agent in establishing and maintaining a growing brokerage which is profitable to both the Agent and the Companies.

3. To maintain the Companies' financial strength at the level necessary to cover the office expenses.

As an independent contractor, Appelle [sic] was free to invite and recruit other subagents for the business. Appellee can not [sic] claim that sales made by its sub agents were not made, at least in part, on Appellee's behalf. Appellee can not [sic] evade liability under the original written contract by claiming that its agents are "independent contractors," when the very Agreement it has with those same agents is clearly written with overall objective to financially benefit both Appellee and the agents in a mutually beneficial and ongoing relationship. Of course the same sales activity benefits the agent as well as Appellee, but the fact that the agents may benefit, does not absolve Appellee of liability, to Appellant.

sales they made and the benefit which accrued to appellee and his subagents have nothing to do with a determination of whether appellants wrongfully reneged on their agreement to make appellee a full partner in the business and receive fifty percent of future profits, with the right to manage the Bowie office in exchange for appellee's contribution of fifty percent of the initial opening expenses and fifty percent of subsequent operating expenses.

There is no authority cited by appellants to provide a framework for our consideration. Because we are unable to comprehend the legal theory appellants advance, we decline to address this assignment of error. See Md. Rule 8–504(a)(5); *see also Electronics Store, Inc. v. Cellco Partnership*, 127 Md.App. 385, 405, 732 A.2d 980 (1999).

Appellants' second argument concerns whether appellee breached the oral contract between the parties. Appellee's failure to consent to what appellants' now characterize as a "proposed modification" of the oral contract, they claim, forecloses the question that appellee breached the agreement because he transferred his license to another broker on April 1, 2003. As support for this argument, appellants rely upon *Dominion National Bank v. Sundowner Joint Venture*, 50 Md.App. 145, 436 A.2d 501 (1981). *Sundowner Joint Venture* involved the consideration of a partnership agreement and whether the agreement limited the liability of the coventurers in the general partnership. *Id.* at 156, 436 A.2d 501. The case *sub judice* involves a cause of action pled for breach of an oral contract on the part of appellants. The *Sundowner Joint Venture* decision is patently inapposite. In any event, appellants fail to direct our attention to any page in the record where they argued to the trial court that they attempted to orally modify the contract.

In an action for breach of contract, the plaintiff must prove that the defendant had a contractual obligation and that the obligation was breached. *Taylor v. Nations-Bank, N.A.*, 365 Md. 166, 175, 776 A.2d 645 (2001). It is the parties' agreement that ultimately determines whether there

has been a breach. Maryland applies the objective law of contracts. *Id.* at 178, 776 A.2d 645. Simply put, a court is to determine from the language of the agreement, what a reasonable person in the position of the parties would have understood the contract to mean at the time the contract was entered into; when the language of the contract is plain and unambiguous, there is no room for construction as the courts will presume that the parties meant what they expressed. *Id.* at 178–79, 776 A.2d 645 (citing *General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306 (1985)). In this case, the parties entered into an oral agreement in which appellee was to manage a new real estate office in Bowie Maryland and they were to split the start-up cost as well as the profits equally. Both sides testified that the above terms comprised the parties' agreement. Appellee alleged that this arrangement was breached by appellants.

At trial, appellee testified that, after opening the office, investing money in the office and managing the office according to those terms, he was informed by appellant that they no longer wanted him to manage the Bowie office. He was further advised that the partnership agreement was being abolished and that the fifty percent arrangement for profit splitting was also being changed to a fifty-one percent forty-nine percent arrangement in favor of appellant. Appellee testified that the changes occurred prior to the time when he left appellants' employ and transferred his license to another broker. Appellee also testified that he was informed that he could be anything else in the business except a manager and could work out of any office except the manager's office.

At the moment when appellee was informed that he would no longer be a manager and share in the profits of the office on an equal basis, the contract between the parties was breached. The difference between fifty percent and forty-nine percent is patently a material difference, particularly in terms of ownership and control in a business relationship. The terms of the agreement were straight forward and the evidence adduced by appellee persuaded the jury that appellants

executed the agreement with no intention, at its inception, of abiding by the terms of the agreement.

**JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**